334 A.2d 588
COMMONWEALTH of Pennsylvania
v.
George Lee HAMILTON, Appellant.

Supreme Court of Pennsylvania.

Argued Nov. 15, 1974.

Decided March 18, 1975.

688

Irving L. Madnick, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., Steven H. Goldblatt, Mark Sendrow, Asst. Dist. Attys., Asst. Chief, Appeals Div., Abraham J. Gafni, Deputy Dist. Atty. for Law, B. H. Levintow, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## ORDER

PER CURIAM.

The Court being equally divided the judgments of sentence are affirmed.

EAGEN, J., filed an opinion in support of affirmance in which O'BRIEN, J., joins.

POMEROY, J., filed an opinion in support of affirmance.

ROBERTS, NIX and MANDERINO, JJ., dissent but deem it unnecessary to discuss the issues treated by the opinions supporting affirmance because those opinions do not represent the views of the Court.

## OPINION IN SUPPORT OF AFFIRMANCE

EAGEN, Justice.

On March 27, 1972, the appellant, George Lee Hamilton, was convicted by a jury of burglary, robbery and two counts of murder in the first degree. After the de-

nial of post trial motions, sentences of life imprisonment, to run concurrently, were imposed on the murder convictions. Additional prison sentences were imposed on the burglary and robbery convictions, and it was directed that these particular sentences be served concurrently with the life imprisonment sentences. This one appeal from the judgments of sentence followed.[1]

The sufficiency of the evidence to warrant the jury's verdict is not in issue, nevertheless we have examined the record and determined the trial evidence was ample to warrant the jury in finding that Hamilton and one Allen Davis, acting in concert, robbed a five and ten cent store at 1816 West Susquehannah Avenue in Philadelphia, on May 16, 1970, during the course of which the proprietors, David and May Bodenstein, were fatally shot by Davis.

Hamilton asserts three assignments of error in this appeal.

■ The first assignment of error concerns the evidentiary use at trial of incriminating statements Hamilton made while in police custody. It is urged this evidence was the product of an unnecessary delay between arrest and arraignment in violation of Rule 118 (now 130) of the Pennsylvania Rules of Criminal Procedure, 19 P.S. Appendix, and, hence, its use at trial was proscribed. See *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972), and *Commonwealth v. Williams*, 455 Pa. 569, 319 A.2d 419 (1974).[2]

The record discloses the following pertinent facts: Hamilton was arrested at 3:30 a. m., May 17, 1970. He

1. As to appellate jurisdiction, see the Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1974–1975), and art. V, § 503(a), 17 P.S. § 211.503(a) (Supp.1974–1975).

2. The trial antedated this Court's decision in *Commonwealth v. Futch*, supra (filed April 20, 1972). Pretrial, Hamilton attempted unsuccessfully to suppress the evidence of his statements to the police on the ground of involuntariness. The issue of "unnecessary delay" is, therefore, properly before us. See *Commonwealth v. Wayman*, 454 Pa. 79, 309 A.2d 784 (1973).

was transported to police headquarters arriving there at 4:00 a. m. The detective in charge of the investigation reached police headquarters at 4:30 a. m. Hamilton was advised of his constitutional rights, as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and affirmatively indicated he understood. He was then questioned briefly beginning at 5:10 a. m. Initially, he denied involvement in the Bodenstein robbery and killing. He was then asked if he were willing to take a polygraph examination. He agreed and was accompanied to a polygraph room at 5:55 a. m. The polygraph examination was completed at 7:30 a. m. Hamilton was then questioned for one-half hour. At 9:00 he was fed a sandwich and coffee. Immediately thereafter, at 9:25 a. m., Hamilton admitted his implication in the Bodenstein crimes. From 9:25 until 11:45 a. m., he related the details of his participation. Following a short luncheon break, a formal statement was recorded on a typewriter between 12:08 p. m. and 2:17 p. m. When finished the statement was read to Hamilton and he signed it at 2:50 p. m.

Hamilton then accompanied police and pointed out the house where the gun used in the killing could be found.[3] After his return to police headquarters, he was questioned by another detective. At 11:50 p. m., he gave an additional statement regarding a conversation between Davis, the co-felon, and one Denise Ingram which took place shortly before both men entered the five and ten cent store.

Between 2:30 a. m. and 3:30 a. m. on May 18, 1970, Hamilton made another statement in which he confirmed that he had showed the police the house where the weapon involved in the shooting was located, and identified the weapon subsequently seized by the police. Hamilton was arraigned at 4:00 a. m.

---

3. A search of this house pursuant to a search warrant resulted in the finding and seizure of the gun.

██ Initially, we note the one-half hour delay between Hamilton's arrival at police headquarters at 4:00 a. m. on May 17, 1970, and the 4:30 a. m. arrival of the detective in charge of the investigation cannot be viewed as unnecessary. This Court has held similar delays to be primarily administrative and, hence, necessary. Cf. *Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974).

██ Even if the period between the arrest and Hamilton's initial incriminating statement[4] is accepted as an "unnecessary delay" within the meaning of Rule 118, suppression of this statement was not required, since this evidence bore no reasonable relationship to the delay. Cf. *Commonwealth v. Rowe,* supra. As this Court stated in *Commonwealth v. Tingle,* 451 Pa. 241, 245, 301 A.2d 701, 703 (1973):

> "Futch did not . . . establish a per se rule that all evidence obtained during an unnecessary delay be excluded. It is only upon the defendant's showing of prejudice from the delay, i. e., a nexus between the delay and the challenged evidence that he is entitled to relief."

Herein the required nexus is missing.

Hamilton's first incriminating statement occurred just less than five hours after the commencement of the "unnecessary delay". Aside from the questions submitted as part of the polygraph examination, the questioning during this period consumed only a little over one-half hour. The subsequent formal statement was merely a reiteration of what Hamilton had already admitted. Under these circumstances, these incriminating statements were

4. This is the relevant period for purposes of Pa.R.Crim.P. 118, since as we said in *Futch,* if unnecessary delay follows a confession, that evidence is not reasonably related to the delay. See, e. g., *United States v. Mitchell,* 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944), and *Virgin Islands v. Gereau,* 502 F.2d 914 (3d Cir. 1974).

not reasonably related to the delay in arraignment. See and compare, *Commonwealth v. Rowe*, supra.

The admissions into evidence of the two additional statements subsequently made by Hamilton to the police, even if it is assumed they were products of an "unnecessary delay", constituted harmless error. Both Hamilton and Denise Ingram testified at trial substantially in accord with the contents of these two statements. Moreover, since Hamilton's initial incriminating statement and his recorded statement were properly admitted into evidence at trial, there was overwhelming evidence of Hamilton's guilt apart from any incriminations included in these subsequent statements. Cf. *Commonwealth v. Townsell*, 457 Pa. 249, 320 A.2d 111 (1974).

Hamilton next contends that his retrial on the same charges after the trial judge had dismissed the jury in his first trial constituted double jeopardy.

Hamilton's first trial commenced on March 8, 1971. The jury retired to begin its deliberation at 1:12 p. m. on March 16th. During the next three days, the jury spent more than twenty-eight hours in actual deliberation. On the morning of March 19th, the fourth day of deliberation, the trial judge instructed the jury to continue to deliberate, and to use all reasonable efforts to arrive at a unanimous decision. The trial judge indicated that, in view of the impending weekend, if a unanimous verdict was not reached by mid-afternoon, the jury would be discharged. The jury continued to deliberate, with only a break for lunch, until 5:15 p. m. The trial judge, despite his earlier intention to discharge the jury, informed the members of the jury, that at the request of both the assistant district attorney and defense counsel, he was directing them to continue to deliberate over the weekend. A colloquy between the trial judge and several jurors ensued, during which several jurors indicated that further deliberation would be useless, since the jury was deadlocked. Despite this, the trial judge ordered the jury to

deliberate over the weekend. As the jurors filed out of the court room, several were hysterical, while others wept and became emotionally upset. The jurors declined to eat their dinners. One juror became nauseated. Another with a heart condition began experiencing chest pains. A juror refused to return to the jury room and resume deliberation. After the trial judge and both counsel had been informed of the state the jury was in, defense counsel stated there was now no question but that the jury should be discharged. Upon inquiry by the trial court, the jury foreman responded that further deliberation would be futile because the jury was hopelessly deadlocked. Asked if they disagreed with the foreman's assessment, the other jurors remained silent. The trial judge then declared a mistrial and discharged the jury.

In *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the Supreme Court of the United States held the Fifth Amendment protection against double jeopardy applicable to the states through the Fourteenth Amendment.

The double jeopardy clause, while attempting to insure that " 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent, he may be found guilty' ", *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L. Ed.2d 543 (1971), does not mean that every time a defendant is put to trial, he is entitled to go free if that trial fails to end in a final judgment, *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

"Double jeopardy attaches if a mistrial is declared without 'manifest necessity' or without the defendant's request or consent." *Commonwealth v. Wideman,* 453 Pa. 119, 122, 306 A.2d 894, 895 (1973).

It has been noted that a genuine inability of the jury to agree constitutes a "manifest necessity" and a trial judge may properly declare a mistrial in such circumstances without bar to reprosecution. See, e. g., *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L. Ed.2d 100 (1963); *Commonwealth v. Monte*, 459 Pa. 495 329 A.2d 836 (1974); *Commonwealth v. Kent*, 355 Pa. 146, 49 A.2d 388 (1946).

As a criterion for determining when a jury is unable to agree, this Court has adopted § 5.4(c) of the American Bar Association Standards Relating to Trial by Jury. *Commonwealth v. Spencer*, 442 Pa. 328, 275 A.2d 299 (1971). Section 5.4(c), supra, provides:

> "The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

■ ■ Under the facts of the instant case, the dismissal of the jury before reaching a verdict in Hamilton's first trial did not infringe his guarantee against double jeopardy. The record clearly discloses that Hamilton's counsel consented to the discharge of the jury and the grant of a mistrial. Moreover, there was "manifest necessity" for the declaration of a mistrial. The jury, after thirty hours of deliberation over a four-day period, had twice declared themselves hopelessly deadlocked. Several jurors were hysterical over the prospect of further confinement, and at least two jurors became ill. In *Commonwealth v. Kent*, supra, the jury after forty hours of deliberation over a three-day period, declared themselves hopelessly deadlocked. One of the jurors became ill and required medical attention. Under those circumstances, this Court held the trial court's declaration of a mistrial to be based on "manifest necessity", thus permitting retrial. Cf. *Commonwealth v. Brown*, 451 Pa. 395, 301 A.2d 876 (1973). In light of these precedents, the trial court was warranted in dismissing the jury and

granting a mistrial. Hence, subsequent retrial on the same charges did not constitute double jeopardy.

Finally, Hamilton contends he was denied his constitutional right to a fair trial because of prejudicial and inflammatory remarks in the prosecution's final argument to the jury. During summation, the assistant district attorney used the following language to the jury:

"Now, it's difficult at best to live in a community of Philadelphia where crime has been so rampant that people are afraid to walk the streets. Women are afraid to go out after dark. Men are afraid to walk their dogs or go to the corner to put a letter in the mail box. Something must be done about this sort of thing."

At this point defense counsel interposed an objection which was sustained by the trial court. The trial judge admonished the assistant district attorney not to refer to safety on the streets.

Later in the closing argument, the prosecutor declared:

"[I]f you let him [defendant] go scott free based on the evidence, then I say to you David and May Bodenstein died in vain . . . and all the other David and May Bodensteins will die in vain—"

Defense counsel, at this point, again objected and was sustained by the trial court.

On neither of these occasions did defense counsel move for a mistrial. The trial judge did not instruct the jury to disregard either argument of the assistant district attorney, nor did he refer to them in his charge.

Initially, we note that the issue is properly before us. It is true the preferred procedure would have been that defense counsel move for a mistrial immediately after objection. *Commonwealth v. Wilcox*, 316 Pa. 129, 173 A. 653 (1934). However, this Court has previously considered the issue of prosecutorial misconduct on appeal in the absence of both objection and motion for

mistrial. *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972).

This Court has recently expressed its criticism of improper and prejudicial comments by district attorneys. See *Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974); and, *Commonwealth v. Revty,* supra. However, while not condoning the remarks of the district attorney, we cannot conclude, on this record, that they were so prejudicial as to deny Hamilton a fair trial. Cf. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In determining whether statements in a prosecutor's final argument to the jury are reversible, this Court has established the following criterion:

> " 'Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant, so that they could not fairly weigh in his behalf such circumstances of doubt, extenuation, or degree of guilt that may be present in the case, and thus make them unable to render a true verdict.' "

*Commonwealth v. Hoffman,* 439 Pa. 348, 355, 266 A.2d 726, 730 (1970), quoting from *Commonwealth v. Meyers,* 290 Pa. 573, 139 A. 374 (1927). By this standard, the language used by the prosecutor did not rise to the level of reversible error.

Nevertheless, we caution prosecuting attorneys that reference to unsafe conditions on the city's streets, rampancy of crime, etc. are inappropriate. They are irrelevant, and have no bearing on the guilt or innocence of the defendant. *United States v. Shirley,* 435 F.2d 1076 (7th Cir. 1970). Even when not improperly moti-

vated, but calculated to exhort the jurors not to shirk their responsibility of returning a verdict of guilty when the evidence so warrants, arguments in this vein appeal to the fears of jurors, and tend to impute the wrongdoing of others to the present defendant. Hence, they should be meticulously avoided.

O'BRIEN, J., joins in this opinion.

JONES, C. J., did not participate in the consideration or decision of this case.

OPINION IN SUPPORT OF AFFIRMANCE

POMEROY, Justice.

I concur in the result but do not join in the opinion of the Court because it involves a retrospective application of the exclusionary rule first announced in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972). *See* the dissenting opinion of this writer in *Commonwealth v. Johnson*, 459 Pa. 171, 327 A.2d 618, 620 (1974) and the opinions therein cited. See also *Commonwealth v. Wilson*, —— Pa. ——, —— n. 6, 329 A.2d 881, 884 n. 6 (1974). (Opinion in support of affirmance).