715 A.2d 404

COMMONWEALTH of Pennsylvania, Appellee,

v.

James DENNIS, Appellant.

Supreme Court of Pennsylvania.

Argued Feb. 3, 1998.

Decided July 22, 1998.

Reargument Denied Aug. 31, 1998.

334

Michael C. Schwartz, Philadelphia, for J. Dennis.

Catherine Marshall, Anthony V. Poneranz, Philadelphia, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

NEWMAN, Justice.

James Dennis (Appellant) appeals from the Judgment of the Court of Common Pleas of Philadelphia County (trial court) sentencing him to death on his conviction for first degree murder. We affirm.

### FACTUAL AND PROCEDURAL HISTORY

At approximately 1:50 p.m. on October 22, 1991, seventeen-year-old Chedell Williams (Victim) and her friend Zahra Howard were climbing the steps to enter the Fern Rock SEPTA station at Tenth and Nedro Streets in Philadelphia when they were approached by Appellant and another man. The men blocked the girls' path and Appellant demanded that the Victim give him her earrings. The girls turned and ran. Appellant followed the Victim and grabbed her in the street. He ripped the earrings from the Victim's ears, drew a .32 caliber handgun, and shot her in the neck, killing her.

Three witnesses had protracted and unobstructed views of Appellant during and after the shooting: Zahra Howard observed the shooting from a nearby fruit vendor's stand; Thomas Bertha, a stone mason who was working on a nearby building, heard the gunshot and saw Appellant flee the scene; and James Cameron, a SEPTA cashier, observed the shooting from approximately eight feet away. Each of the three witnesses positively identified Appellant as the perpetrator from a photo array, at a lineup, and again at trial.

At Appellant's jury trial, the Commonwealth presented the testimony of the three eyewitnesses, as well as evidence that Appellant had a gun of the type used in the murder and clothing resembling that worn by the perpetrator. Appellant argued that the eyewitnesses had misidentified him, and claimed that he was on a bus to the Abbottsford Homes at the time of the murder. The jury returned verdicts of guilty on charges of first degree murder,[1] robbery,[2] criminal conspiracy,[3] violating the Uniform Firearms Act,[4] and possessing an instrument of crime.[5]

At the penalty hearing, the Commonwealth sought the death penalty on the basis of two aggravating circumstances:

1. 18 Pa.C.S. § 2502(a).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903.
4. 18 Pa.C.S. § 6101 *et seq.*
5. 18 Pa.C.S. § 907.

that Appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and that, in the commission of the offense, Appellant knowingly created a grave risk of death to another person in addition to the Victim, 42 Pa.C.S. § 9711(d)(7). Defense counsel raised three mitigating factors: that Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); Appellant's age at the time of the crime (twenty-one), 42 Pa.C.S. § 9711(e)(4); and the general mitigating factor of Appellant's character and record, 42 Pa.C.S. § 9711(e)(8). The jury found one aggravating circumstance, killing while in the perpetration of a felony, and one mitigating circumstance, no significant history of prior criminal convictions, and that the aggravating circumstance outweighed the mitigating circumstance. Accordingly, the trial court sentenced Appellant to death.

Appellant filed Post–Verdict Motions, which the trial court denied, and then appealed to this Court.

## DISCUSSION

In this appeal, Appellant challenges various aspects of both the guilt phase and penalty phase of his trial. We address the issues seriatim.[6]

### 1. ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant argues that his trial counsel was ineffective in a number of respects. To prove ineffectiveness of counsel, Appellant must show that: (1) the claim is of arguable merit; (2) counsel had no reasonable basis for the action or inaction; and (3) if not for counsel's ineffectiveness, the outcome of the trial would have been different. *See, e.g., Commonwealth v.*

---

**6.** Although Appellant does not raise the issue, pursuant to *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), we are required to determine whether there was sufficient evidence to sustain Appellant's conviction. Here, three eyewitnesses positively identified Appellant as the perpetrator, and there was evidence that Appellant had a gun and clothing resembling those of the killer. Thus, the evidence was more than sufficient to sustain Appellant's convictions for first degree murder and related crimes.

*Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). We apply this standard to Appellant's claims, as follows:

### a. *Failure to investigate witness Latanya Cason*

■ At trial, Cason testified that she saw Appellant at the Abbottsford Homes, about four miles from the crime scene, at approximately 4:00 to 4:30 p.m., more than two hours after the 1:50 p.m. shooting. Cason's recollection of the time was based on her belief that she had left work and gone to cash a welfare check at approximately 2:00 p.m. During their investigation, however, the police came into possession of a Department of Public Welfare (DPW) receipt showing that Cason cashed her check at 1:03 p.m.

In light of this evidence, Appellant argues that trial counsel was ineffective for failing to investigate Cason, because an investigation would have revealed that she was mistaken about the time she saw Appellant at the Abbottsford Homes. Had trial counsel been effective, Appellant argues, Cason would have supported Appellant's alibi by testifying that she saw Appellant at approximately 2:30 p.m. Appellant also argues that the Commonwealth withheld the DPW receipt in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that trial counsel was ineffective for failing to discover the violation.

Appellant's claims fail for a number of reasons. First, even if trial counsel had investigated Cason and discovered that she saw Appellant at the Abbottsford Homes at 2:30 p.m., her testimony would not support Appellant's alibi, because the murder occurred at 1:50 p.m., forty minutes earlier than Cason's earliest estimate. Moreover, Cason's testimony would have been cumulative of the testimony of witness Willis Meredith, who testified that he saw Appellant at the Abbottsford Homes at approximately 2:15 to 2:30 p.m. *See Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998) (counsel not ineffective for failing to present cumulative testimony); *Commonwealth v. Robinson,* 487 Pa. 541, 410 A.2d 744 (1980) (same). Finally, it is clear that there clearly was no *Brady*

violation. The DPW receipt was not exculpatory, because it had no bearing on Appellant's alibi, and there is no evidence that the Commonwealth withheld the receipt from the defense. Accordingly, Appellant's claims of ineffectiveness regarding Cason and the DPW receipt have no arguable merit.

b. *Failure to impeach witness Charles Thompson*

█ Thompson, who was in a singing group with Appellant, testified that, on the night of the murder, he saw Appellant with a gun that resembled the murder weapon.[7] On direct examination, Thompson admitted that he had an open criminal case for drug possession. Appellant argues that trial counsel was ineffective for failing to impeach Thompson with evidence that his open drug case was for possession with intent to deliver, a felony, not simple possession, a misdemeanor. Appellant also argues that the prosecutor violated *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by knowingly offering Thompson's false testimony, and that trial counsel was ineffective for failing to discover the violation.

Appellant's claims have no merit. Trial counsel adequately cross-examined Thompson on other matters and offered testimony of other members of the singing group that undermined Thompson's credibility. Consequently, counsel's showing that Thompson was charged with possession with intent to deliver instead of simple possession would have been of little or no benefit to Appellant. Even if the proposed impeachment had caused the jury to disbelieve Thompson's testimony in its entirety, considering the overwhelming evidence of Appellant's guilt, there is no indication that the outcome of the trial would have been different. As for the alleged *Giglio* violation, Appellant presents no evidence that the prosecutor knew that Thompson's open case was for possession with intent to deliver instead of simple possession. Consequently, Appellant fails

7. Although the murder weapon was never recovered, a ballistics expert testified that there was a ninety-nine percent (99%) chance that the bullet that killed the Victim was fired from a Harrington and Richardson handgun.

to demonstrate ineffective assistance of counsel with respect to Thompson.

### c. *Failure to establish the Victim's height*

■ At trial, the medical examiner testified that the bullet that killed the Victim entered her neck and traveled in a slightly downward path. Appellant argues that trial counsel was ineffective for failing to establish the Victim's height, five feet ten inches, relative to Appellant's height, five feet five inches, because such evidence would have cast doubt on Appellant's ability to shoot the Victim such that the bullet would travel in the manner described by the medical examiner. This argument is patently without merit. According to the eyewitnesses, prior to shooting the Victim, the killer ripped the earrings from her ears, thereby pulling her head and neck down. Ergo, the relative heights of the killer and the Victim were irrelevant.

### d. *Failure to call eyewitnesses who did not identify Appellant*

■ Appellant argues that trial counsel was ineffective for failing to call eyewitnesses David LeRoy and Anthony Overstreet, both of whom observed the shooting but did not testify at trial. LeRoy told the police that he "caught a glimpse" of the killer's face, but could not identify him at a photo array. Overstreet identified Appellant from a photo array, but made a misidentification at a lineup. Although these two witnesses could not positively identify Appellant as the killer, Appellant does not show how their testimony would have discredited that of the three eyewitnesses who did positively identify him. Hence, this claim warrants no relief.

### e. *Failure to raise a Batson claim*

■ In voir dire, the prosecutor exercised twenty peremptory challenges, dismissing thirteen African–American venirepersons, two Hispanic venirepersons, and five Caucasian venirepersons. Appellant argues that the prosecutor's use of peremptory challenges violated *Batson v. Kentucky*, 476 U.S.

79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that trial counsel was ineffective for failing to raise this issue. This argument is meritless. In the first instance, Appellant fails to indicate the race of forty-seven of the 170 venirepersons. Without such information, there is no basis for a *Batson* claim. *See, e.g., Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). Furthermore, Appellant offers no evidence that the prosecutor exhibited racial animus in striking African–American venirepersons. Indeed, the impaneled jury included four African–American jurors and one African–American alternate, which indicates a lack of racial animus. Trial counsel was not ineffective for failing to raise a plainly baseless *Batson* claim.

### f. *Failure to object to "bad character" evidence*

As part of Appellant's defense case, trial counsel presented nine "good character" witnesses who testified that Appellant had a good reputation in the community for being honest, truthful, peaceable and law abiding. In rebuttal, the Commonwealth presented three "bad character" witnesses who testified that Appellant's reputation in the community was exactly the opposite. Two of the Commonwealth's witnesses were victims of robberies allegedly committed by Appellant, and the other was a police officer who was investigating the robberies.[8] Appellant argues that trial counsel was ineffective for failing to object to the testimony of the Commonwealth's witnesses because, he alleges, they were not members of Appellant's community and had no foundation for their testimony other than their knowledge of specific bad acts, to which they could not testify. *See, e.g., Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607 (1981).

Appellant's argument has no merit. All three of the Commonwealth's witnesses testified that they knew people in Appellant's community and were familiar with Appellant's reputation among those people. Hence, trial counsel had no

---

8. The jury was not informed of the witness' specific history with Appellant. Instead, the witnesses merely testified as people who knew Appellant's reputation in the community.

basis to object to their testimony regarding Appellant's reputation. *See, e.g., Commonwealth v. Hansell,* 185 Pa.Super. 443, 447, 137 A.2d 816, 819 (1958) (citations omitted) ("The test [for admitting reputation evidence] is whether the witness knows the voice of the resident community [concerning the defendant's reputation].")

g. *Failure to investigate the Victim's school records*

In his opening and closing statements, the prosecutor described the Victim as an aspiring college student. Appellant argues that trial counsel was ineffective for failing to investigate the Victim's school records to determine whether her grades were good enough for her to go to college. This argument is baseless and warrants no further consideration.

h. *Failure to request a mistrial due to evidence of Appellant's unemployment*

On direct examination, the prosecutor asked Appellant's father whether Appellant had ever worked during the two years Appellant had lived with him. The purpose of the question was to establish motive. Trial counsel objected to the question, and the trial court overruled the objection. The following day, the prosecutor brought to the court's attention caselaw holding that a defendant's unemployment may not be used to show motive. *See Commonwealth v. Barkelbaugh,* 526 Pa. 133, 584 A.2d 927 (1990); *Commonwealth v. Haight,* 514 Pa. 438, 525 A.2d 1199 (1987). The court gave the jury a curative instruction, directing them not to consider unemployment as a motive. Appellant argues that trial counsel was ineffective for failing to request a mistrial based on the erroneous admission of evidence of Appellant's unemployment.

Appellant's argument has no merit. The trial court's curative instruction is presumed to be sufficient to cure any prejudice to Appellant, *see, e.g., Commonwealth v. English,* 548 Pa. 528, 699 A.2d 710 (1997), and he offers no evidence to rebut this presumption. Consequently, no relief is due.[9]

9. Appellant also alleges that trial counsel was ineffective for failing to object to the introduction of his school records and for failing to object

### i. *Failure to seek suppression of clothing*

 Pursuant to a valid search warrant, the police seized clothing from Appellant's father's home (where Appellant resided) that matched eyewitnesses' descriptions of clothing worn by the killer. The clothing was lost or destroyed before trial, and therefore was never introduced into evidence. Nevertheless, the prosecutor questioned Appellant and his father about the clothing. Appellant argues that trial counsel was ineffective for failing to seek suppression of the clothing, and for failing to object to the prosecutor's questions about it.

Appellant's arguments have no merit. Because the clothing was lost or destroyed before trial, there was no need to seek its suppression; and, instead of objecting to the prosecutor's references to the clothing, trial counsel emphasized the absence of the clothing to derogate the credibility of the prosecutor's entire case. Trial counsel's strategy was clearly a reasonable attempt to advance Appellant's interests, and therefore cannot be deemed ineffective.

### j. *Failure to object to the trial court's Kloiber instruction*

 With respect to identification testimony, the trial court instructed the jury that they "should receive the testimony with caution." Appellant argues that trial counsel was ineffective for failing to object that, pursuant to *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), the trial court was required to instruct the jury that they *must* receive the testimony with caution, not that they *should* do so. In this case, however, the three eyewitnesses who testified had protracted and unobstructed views of Appellant and consistently identified him as the killer throughout the investigation and at trial. Accordingly, there was no need for a *Kloiber* instruction, and the trial court's instruction that the jury "should receive the [identification] testimony with caution" could only have benefited Appellant.

to the prosecutor's intimation that his alibi defense was fabricated. These claims are patently meritless, and therefore warrant no further comment.

### k. *Bolstering the prosecutor's credibility during closing argument*

During his closing argument, trial counsel made, *inter alia,* the following remarks:

> Mr. King [the prosecutor] is probably the top prosecutor in [the District Attorney's Office], and certainly a gentleman I respect to the utmost.... But, ladies and gentlemen, as if his vast skills are not enough, in this case he has at his fingertips all of the vast resources of his own office, the District Attorney's Office.... But, ladies and gentlemen, what does James Dennis have? James Dennis simply had, ladies and gentlemen, the prayers of his family and me. That's it.

N.T., October 15, 1992, at 52–53. Appellant argues that trial counsel was ineffective for making these comments that disparaged his own skills and bolstered the credibility of the prosecutor. Appellant, however, does not demonstrate that trial counsel's strategy was unreasonable, nor that he was prejudiced by counsel's remarks. Hence, we cannot conclude that trial counsel was ineffective.

### l. *Failure to object to evidence of Appellant's prior drug conviction*

During the penalty phase of the trial, the prosecutor presented the testimony of the court clerk, who erroneously testified that Appellant had been convicted of possession of crack cocaine with intent to deliver. In fact, Appellant had been convicted of simple possession. On cross-examination, trial counsel questioned the clerk about the error, and she corrected it. The trial court subsequently instructed the jury that, as a matter of law, Appellant had no significant history of prior criminal convictions, i.e., that Appellant had proven the mitigating factor of 42 Pa.C.S. § 9711(e)(1). Although Appellant argues that trial counsel was ineffective for failing to object to the clerk's testimony, in light of the trial court's instruction, Appellant could not have suffered any prejudice. Ergo, no relief is due.

m. *Failure to "life qualify" the jury*

During voir dire, the trial court, pursuant to *Wither-spoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), "death qualified" the jury by asking venirepersons whether any of them could not impose the death penalty under any circumstances. Appellant argues that trial counsel was ineffective for failing to request that the court "life qualify" the jury, pursuant to *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), by asking the venirepersons whether any of them would automatically vote for the death penalty if they found Appellant guilty of first degree murder. We have held, however, that counsel's failure to "life qualify" a jury constitutes ineffectiveness only where the defendant shows that one or more of the impaneled jurors would automatically impose the death penalty. *See, e.g., Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037 (1996). Here, Appellant does not even attempt to meet this burden. Hence, the ineffectiveness claim fails.

2. *Prosecutor's Closing Argument in the Guilt Phase*

Appellant argues that improper comments in the prosecutor's closing argument deprived him of a fair trial and violated his right to due process. To warrant relief, however, Appellant must show that, considering all the circumstances of the case, the unavoidable effect of the comments was to prejudice the jury against Appellant, causing them to form a fixed bias and hostility toward him such that they could not render a fair and impartial verdict. *See Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996). We have held that "the first and brightest line" of impropriety in a closing argument is "at the point where the language and inferences of the summation no longer relate back to the evidence on the record." *Commonwealth v. Johnson*, 516 Pa. 527, 530, 533 A.2d 994, 996 (1987). In this case, while we believe that some of the prosecutor's comments in his closing argument were inappropriate, we do not believe that the argument in its entirety crossed this line.

348

We begin by noting that the evidence of Appellant's guilt was, by any estimate, quite overwhelming. The Commonwealth presented three eyewitnesses to the murder, and each positively identified Appellant as the perpetrator from a photo array, at a lineup, and again at trial. There was evidence that Appellant had a gun of the type used in the murder and clothing resembling that worn by the perpetrator. This Court has held that, "[w]here evidence of guilt is overwhelming, a prejudicial remark by the prosecutor will not be grounds for reversal." *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 76 (1994). *See also Commonwealth v. White*, 515 Pa. 348, 528 A.2d 596, 599 (1987). Consequently, Appellant's claim of prosecutorial misconduct has one strike against it from the outset.

Appellant first complains of the following remarks:

In this case, ladies and gentlemen, let's get back to why I am standing up here talking to you. Sometimes I realize that there are people who are happy in their jobs, there are children who are happy, there are people able to go to sleep without locking their doors, where young ladies can walk the street at night and not be afraid, and where young ladies could, in fact, be young ladies.

* * *

Mr. Mandell [defense counsel] mentioned motive. Must there be a motive? Are we coming to a situation of the haves against the have nots? Are we coming to a situation that when you get up in the morning and decide what to wear, what jewelry to wear, that you put a target on your chest and on your back? 'Cause this is what this case is about.

This case is about right and this case is about freedom. We're talking about the right that is right. We're talking about the right to take public transportation. We're talking about the right to be able to use public transportation without the fear of someone waiting to get paid, someone waiting to rip you off. 'Cause this is what this case is about, ladies and gentlemen. It's not about race, it's not about size

and height. What it's about, ladies and gentlemen, is this. A young lady named Chedell Williams. *Another way of putting it would be something such as this.* That my best witness is not here. That's why I'm standing here.

N.T., October 15, 1992, at 87–90.

Although these comments strayed somewhat from the evidence, and were therefore inappropriate, we cannot conclude that their unavoidable effect was to prejudice the jury against Appellant to the extent that they could not render a true verdict. Indeed, we have previously allowed similar remarks about the impact of a defendant's actions on the community. *See, e.g., Commonwealth v. Thompson,* 538 Pa. 297, 648 A.2d 315, 323 (1994) (Prosecutor's remark that, "what we are really talking about is beyond those walls, beyond those windows, spilling out into the streets of North Philadelphia, where ordinary people walk, live, breathe and die, every day," was not improper); *Commonwealth v. Hamilton,* 460 Pa. 686, 334 A.2d 588, 593 (1975) (Although the comments were inappropriate, the jury could still render a fair verdict where the prosecutor commented that, "it's difficult at best to live in a community of Philadelphia where crime has been so rampant that people are afraid to walk the streets. Women are afraid to go out after dark. Men are afraid to walk their dogs or go to the corner to put a letter in the mail box. Something must be done about this sort of thing.").

Next, Appellant focuses on the following passages:

In an urban situation, Ladies and Gentlemen, it's now popular to use cliches. Back in a drug epidemic, somebody said, 'just say no.' And all the citizens were up in arms following 'just say no.' Then at another time, someone said, 'get involved.' And then what people call the ghetto code, I don't see anything, I don't know anything, I don't want to become involved.

\*　　\*　　\*

And believe me, Ladies and Gentlemen, at this time when the male role in the community is questioned, it is refreshing to see two men like Mr. Cameron and Mr. Bertha stand

up, out of outrage, stand up, because someone has to stand up, with the degree that our young people are laid down.

\* \* \*

Two finger rings, one gold chain, earlobes bleeding from where the earrings were snatched. Did she leave a legacy? I hope she did. And it's not in a—it's not in a slogan or cliche, don't wear jewelry. It's not in a slang and it's not in a cliche, if you wear jewelry go in a group. What this is about, ladies and gentlemen, is stopping the person from trying to take advantage. Wearing earrings when they sell you those earrings, they don't put a sign on them that says, wearing these earrings might be hazardous to your life. But that's the reality under which we now live.

N.T., October 15, 1992, at 92–98.

■ These excerpts, however, present an incomplete and distorted picture of the prosecutor's full closing argument. It is fundamental that, "in order to evaluate whether [the prosecutor's] comments were improper, we must look at the context in which they were made." *Commonwealth v. Morales,* 549 Pa. 400, 424, 701 A.2d 516, 528 (1997). *See also Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1267 (1992). Here, Appellant overlooks the fact that the prosecutor's remarks were interspersed with commentary specifically pertaining to the testimony presented at trial:

*You heard the truth from the friend, Miss Howard. She was there.... [Defense counsel] stands up and he says, that's not enough. Because she said, "I think." You saw her on the stand, ladies and gentlemen. Was she lying? Was she evasive? Did she stand strong? Did at any time she say, this is not the man?*

*But our evidence didn't stop there.* In an urban situation, Ladies and Gentlemen, it's now popular to use cliches. Back in a drug epidemic, somebody said, 'just say no.' And all the citizens were up in arms following 'just say no.' Then at another time, someone said, 'get involved.' And then what people call the ghetto code, I don't see anything, I don't know anything, I don't want to become involved.

*In this case, Ladies and Gentlemen, I would hasten to add that wasn't the case. You have Zahra Howard, the friend, you have James Cameron, the bus driver, you have Thomas Bertha, the contractor. Why did they get involved? Because something happened that should not have happened. Something happened that was tragic. And maybe, as my grandmother once said, if you can't stand for something, you'll fall for anything. And in this particular case, I would submit to you that you witnessed a show. That show didn't come from this side of the room, but it came from that side of the room.*

✳ ✳ ✳

*Miss Howard, thank you for coming forward. Charles Thompson, he came in here. Yeah, he's the only person I called that had some kind of taint on him. He has an open case involving drugs. But who is a friend of? What group is he a member of?*

✳ ✳ ✳

*Oh yeah, I'm the prosecutor in this case. I call the shots. I decided who you would hear, the form of the evidence you would hear. I would submit to you that you heard from the witnesses. You saw what there was to see.*

N.T., October 15, 1992, at 91–92 (emphasis added).

Considering these remarks in context, we cannot conclude that the prosecutor strayed so far from the evidence that Appellant was deprived of a fair trial. On the contrary, the remarks are well within the bounds prescribed by *Johnson, supra. See also Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811 (1994) (Taken in context, prosecutor's comments focused on the evidence, and therefore warranted no relief).

Similarly, the final passage of which Appellant complains focused primarily on the evidence of record:

As I sit down, ladies and gentlemen, the buck stops right here. And I'm not talking about the buck that goes up and down, I'm talking about the buck that you are. You are this community. You are the Commonwealth. This case is entitled the Commonwealth of Pennsylvania versus James

Dennis. These are your streets. This is your town. The victims, the witnesses, and the defendants are products of a system that we all support. Mr. Lincoln said, 'judgment falls on a person when there's something within that person we cannot abide.' I would submit to you that's greed and murder. *If you believe the witnesses and if you believe them when they say James Dennis is the man, that's the man, that's his face, it was a gun like this, he had a gun like this in his waistband, forget the would have, should have, could haves and deal with it.... In this case, I submit to you, Miss Williams suffers in any final solution. Miss Williams is dead, and the evidence shows that James Dennis killed her. The Commonwealth asks you for a verdict of guilty of murder in the first degree. We will not compromise where, I submit to you, that was a cold blooded act of murder, willful, deliberate, and intentional, based on the testimony of the witnesses and the doctor.* Thank you. And as I said in my opening, stick a fork in him and turn him over. He will be done when you say he is done.

N.T., October 15, 1992, at 102–04 (emphasis added).

As we noted in *Hamilton, supra,* the prosecutor should not have couched his argument in terms of general societal problems to the extent that he did. Nevertheless, we cannot ignore the fact that the focus of the argument consistently returned to the abundant evidence of Appellant's guilt. The Commonwealth presented three credible witnesses who testified with unyielding certainty that they saw Appellant shoot Chedell Williams, and the prosecutor made this testimony the core of his closing argument. Consequently, we cannot conclude that the prosecutor's remarks so prejudiced the jury against Appellant that they could not evaluate the evidence fairly and impartially.

Furthermore, we note that the trial court repeatedly warned the jury that they must put aside emotion and decide the case solely on the evidence:

This case is not to be concerned or governed by emotion, it's to be governed strictly by the evidence, and your decision is

to rely strictly on the evidence and not on emotions.[10]

\* \* \*

Consider the issues in this case fairly, impartially, and without passion, prejudice or sympathy.... You must be very careful in analyzing what the evidence is and using all of those faculties in determining what the true facts are in this case. And I can't stress too strongly that that has to be decided without sympathy or emotion.[11]

\* \* \*

In trying to find the truth about a matter, the first thing that you do is examine the evidence, coldly and dispassionately, without sympathy for one side or the other. You're like a scientist. All you're interested in is to find the truth, unaffected by any other consideration.[12]

These instructions were more than sufficient to eliminate any prejudice caused by the prosecutor's comments. *See, e.g., Commonwealth v. Scarpino,* 494 Pa. 421, 431 A.2d 926, 932 (1981) ("Any possible prejudice [caused by the prosecutor's closing argument] was addressed and eliminated by the trial judge's prompt attention to the matter."); *Commonwealth v. Johnson,* 496 Pa. 546, 437 A.2d 1175, 1177–78 (1981) ("[T]he judge's cautionary instruction covered any emotional appeal contained in [one of the prosecutor's remarks] as well as the other references to which trial counsel objected.").

Considering the totality of the circumstances—overwhelming evidence of Appellant's guilt, the prosecutor's consistent references to the evidence, and the trial court's ample cautionary instructions—we cannot conclude that the unavoidable effect of the prosecutor's closing argument was to prejudice the jury against Appellant such that they could not render a fair and impartial verdict. Accordingly, we grant no relief.

**10.** N.T., October 15, 1992, at 91.

**11.** *Id.* at 107.

**12.** *Id.* at 114.

### 3. PROSECUTOR'S CLOSING ARGUMENT IN THE PENALTY PHASE

■ Appellant also argues that the prosecutor's closing argument in the penalty phase was unduly prejudicial. We review the prosecutor's remarks to determine whether "the sentence of death may have been the product of passion, prejudice or in any way arbitrary." *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 54, 454 A.2d 937, 958 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); 42 Pa.C.S. § 9711(h)(3).

First, Appellant argues that the prosecutor improperly "injected himself into the process" by commenting on the fact that he cancelled a planned vacation so he could participate in the sentencing hearing, by referring to his own feelings about the case, and by stating that he "owe[d] it to the memory of Chedell Williams, and ... to the family" to be present at the sentencing hearing. Although Appellant argues that the prosecutor's comments amounted to "a personal vouching that the death penalty was the only appropriate sentence," this interpretation has absolutely no foundation. We can discern no prejudice as a result of these remarks.

■ Appellant further argues that the prosecutor improperly appealed to the passions of the jury, e.g., by comparing Appellant's age (twenty-one) to that of the Victim (seventeen) and urging the jury to reject age as a mitigating factor, by discounting Appellant's mitigation witnesses, and by repeatedly exhorting the jury to "stop Jimmy Dennis." Again, Appellant fails to show any prejudice as a result of these comments, particularly in light of the trial court's instructions to the jury that, "your decision should not be based on any feeling of vengeance, it should not be based on prejudice.... Your decision should be based on the evidence and the fact of the inferences that reasonably flow from the evidence." N.T., October 19, 1992, at 141. As we held in *Commonwealth v. Chambers*, 528 Pa. 558, 581–82, 599 A.2d 630, 641–42 (1991):

> There is nothing improper in the prosecutor arguing the appropriateness of the death penalty because that is the only issue before the jury at the penalty phase of the trial.

[Citation omitted]. In the case at bar, the trial judge determined that the prosecutor's remarks were not prejudicial.... Further, the judge reminded the jury of their duty under the law and that their determination of the facts, not the beliefs of counsel, governed the outcome of the case. These instructions put the prosecutor's comments into their proper context and dispel any argument of prosecutorial misconduct.

Thus, we find no impropriety in the prosecutor's closing argument.

### 4. AFTER-DISCOVERED EVIDENCE

Appellant argues that he is entitled to a remand for consideration of after-discovered evidence. To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. *See, e.g., Commonwealth v. McCracken,* 540 Pa. 541, 659 A.2d 541 (1995); *Commonwealth v. Wilson,* 538 Pa. 485, 649 A.2d 435 (1994). Here, neither of Appellant's two items of after-discovered evidence meet this test.

First, Appellant argues that the case should be remanded to consider the statement of Shanaqua Ramsey, a friend of Zahra Howard, one of the eyewitnesses to the murder. On April 3, 1997, Ramsey gave an affidavit in which she stated that when Zahra Howard returned to school after the murder, she told Ramsey that she was not sure if the person she identified (Appellant) was the killer because she did not get a good look at the killer. Ramsey's statement fails to meet at least two prongs of the after-discovered evidence test: the alleged conversation between Ramsey and Zahra Howard took place nearly a year before trial, and there is no evidence that it was discoverable only after trial; and the evidence would only be

used to impeach Zahra Howard. Hence, this claim warrants no relief.

Next, Appellant argues that a remand is necessary to consider the January 24, 1996 statement of Charles Thompson, in which Thompson recanted his statement to the police about seeing Appellant with a gun, and claimed that he lied on the witness stand during the prosecutor's direct examination. Recantation, however, is notoriously unreliable, particularly where the witness claims to have committed perjury. *See, e.g., Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). Moreover, there is no indication that the substance of Thompson's statement could not have been elicited on cross-examination at trial. Hence, no relief is due.

5. REMAND FOR EVIDENTIARY HEARING ON THE BATSON ISSUE

Appellant argues that he is entitled to a remand for consideration of the *Batson* issue. This argument is meritless. *See* Issue 1(e), *supra.*

6. REMAND TO COMPLETE DISCOVERY

Appellant argues that he has had difficulty obtaining discovery in this case, and, therefore, the case should be remanded to ensure that the record is complete. This argument is completely without foundation, and therefore warrants no further consideration.

7. PROPORTIONALITY OF SENTENCE

Finally, Appellant argues that the case should be remanded for a new sentencing hearing because, he alleges, his sentence is disproportionate to the sentence in similar cases. This argument is patently without merit. A sentence of death is not uncommon where the defendant has committed a robbery that results in murder. *See, e.g., Commonwealth v. Uderra,* 550 Pa. 389, 706 A.2d 334 (1998); *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441 (1997); *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998); *Commonwealth v. Washington,* 549 Pa. 12, 700 A.2d 400 (1997); *Common-*

*wealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, *cert. denied,* ——
U.S. ——, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997).

## CONCLUSION

For all of the foregoing reasons, we affirm Appellant's
convictions for first degree murder, robbery, criminal conspir-
acy, violating the Uniform Firearms Act, and possessing an
instrument of crime, and we affirm his death sentence.

ZAPPALA, J., files a dissenting opinion in which
FLAHERTY, C.J., and SAYLOR, J., join.

ZAPPALA, Justice, dissenting.

Because I believe the statements made by the prosecutor to
the jury during closing argument constituted improper prose-
cutorial misconduct that deprived Appellant of a fair and
impartial verdict, I dissent.

It is recognized that a claim of prosecutorial misconduct will
only constitute grounds for relief when, in viewing all of the
circumstances of the case, the unavoidable effect of the con-
tested comments was to prejudice the jury, forming in their
minds fixed bias and hostility toward the accused, so as to
hinder an objective weighing of the evidence and impede the
rendering of a true verdict. *Commonwealth v. Jones,* 546 Pa.
161, 683 A.2d 1181 (1996). Not every intemperate or improp-
er remark by the prosecutor requires a new trial. *Common-
wealth v. Jarvis,* 482 Pa. 598, 394 A.2d 483 (1978). Generally,
comments made by a prosecutor do not constitute reversible
error, and prosecutorial misconduct will not be found, where
comments are based on the evidence or proper inferences
therefrom. *Commonwealth v. Chester,* 526 Pa. 578, 599–600,
587 A.2d 1367, 1377, *cert. denied,* 502 U.S. 959, 112 S.Ct. 422,
116 L.Ed.2d 442 (1991). In *Commonwealth v. Johnson,* 516
Pa. 527, 533 A.2d 994 (1987), this court stated that

> [i]n broad terms, we have drawn the first and brightest line
> at the point where the language and inferences of the
> summation *no longer* relate back to the evidence on the
> record. In effect, the prosecutor is bound by our law to

argue *only those inferences which derive reasonably from the evidence* of the trial.

516 Pa. at 530, 533 A.2d at 996 (emphasis added).

While recognizing the foregoing dictate and the fact that the prosecutor's comments strayed from the evidence, op. at 411, 412, the majority, nevertheless, concludes that because the prosecutor interspersed references to the evidence in his closing, along with his improper comments, the overall effect of his summation was not prejudicial. I cannot agree.

The prosecutor continually urged the jury to consider matters outside the evidence in an attempt to improperly appeal to the juror's fears and emotions:

In this case, ladies and gentlemen, let's get back to why I am standing up here talking to you. Sometimes I realize that there are people who are happy in their jobs, there are children who are happy, there are people able to go to sleep without locking their doors, where young ladies can walk the street at night and not be afraid, and where young ladies could, in fact, be young ladies.

\* \* \* \* \*

Mr. Mandell mentioned motive. Must there be a motive? Are we coming to a situation of the haves against the have nots? Are we coming to a situation that when you get up in the morning and decide what to wear, what jewelry to wear, that you put a target on your chest and on your back? 'Cause this is what this case is about.

This case is about right and this case is about freedom. We're talking about the right that is right. We're talking about the right to take public transportation. We're talking about the right to be able to use public transportation without the fear of someone waiting to get paid, someone waiting to rip you off. 'Cause this is what this case is about, ladies and gentlemen. It's not about race, it's not about size and height. What it's about, ladies and gentlemen, is this. A young lady named Chedell Williams. Another way of

putting it would be something such as this. That my best witness is not here. That's why I'm standing here.

(N.T. October 15, 1992, 87–88, 89–90).

The majority cites to our decisions in *Commonwealth v. Thompson,* 538 Pa. 297, 648 A.2d 315 (1994), and *Commonwealth v. Hamilton,* 460 Pa. 686, 334 A.2d 588 (1975), as support for the proposition that this court has permitted references to societal problems and the impact that the accused's behavior has on society.

While the majority correctly notes that in *Thompson* and *Hamilton* we reviewed claims of prosecutorial misconduct based upon the prosecution's references to the problems of society in general and the impact of the defendants' behavior thereon,[1] in *Hamilton,* we specifically cautioned against utilizing such references in the future:

> We caution prosecuting attorneys that reference to unsafe conditions on the city's streets, rampancy of crime, etc. *are inappropriate. They are irrelevant, and have no bearing on the guilt or innocence of the defendant.* Even when not improperly motivated, but calculated to exhort the jurors not to shirk their responsibility of returning a verdict of guilty when the evidence so warrants, *arguments in this vein appeal to the fears of jurors, and tend to impute the wrongdoing of others to the present defendant. Hence, they should be meticulously avoided.*

460 Pa. at 698–699, 334 A.2d at 594 (emphasis added) (citation omitted). We declined to grant the appellant a new trial in *Hamilton,* noting that, based on the record before us, we

---

1. In *Thompson,* we declined to grant a new trial where the prosecutor, at the *penalty phase,* stated, among other things, that "what we are really talking about is beyond those walls, beyond those windows, spilling out into the streets of North Philadelphia, where ordinary people walk, live, breathe and die, every day...." 538 Pa. at 313, 648 A.2d at 323. However, as noted, in *Thompson* the appellant complained of comments made by the prosecutor at the penalty phase, as opposed to here where the complained of commentary was made during the guilt phase. We have afforded the prosecution reasonable latitude in making arguments at the penalty phase given that the presumption of innocence is no longer applicable. *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181 (1996).

could not say that the prosecutor's improper remarks unavoidably prejudiced the jury.[2]

Following our decision in *Hamilton,* we addressed the issue of prosecutorial misconduct in a context similar to the case at bar in *Commonwealth v. Cherry,* 474 Pa. 295, 378 A.2d 800 (1977). In *Cherry,* we granted a new trial where the prosecutor, in his summation, asked the jury to put themselves in the place of his key witness and think about how they would feel if they were questioned about inconsistencies in their testimony. Additionally, the prosecutor in *Cherry* stated:

> Please tell the people of Philadelphia that where (sic) one, even though he doesn't pull the trigger, takes part in and knows ahead of time that there is going to be a robbery, knows that at least one of the men has a gun, knows all that, goes along with it, tell everybody by your verdict that you are not going to put up with shootings on the street like the wild west.

474 Pa. at 301, 378 A.2d at 803. Based on the prosecutor's comments, we determined that the grant of a new trial was warranted. We noted that the prosecution's argument "was an invitation to the jurors to shift their inquiry from the guilt or innocence of appellant to the need to make an example of someone accused of participating in a public shooting." *Cherry,* 474 Pa. at 305, 378 A.2d at 805. We relied on our decision in *Commonwealth v. Harvell,* 458 Pa. 406, 411, 327 A.2d 27, 30 (1974), wherein the prosecutor stated, "[m]en are afraid to walk the streets themselves," "[p]eople don't want to go out at night," and "it might be you next time. It might be you." In *Harvell,* we granted the appellant a new trial, noting that such statements "divert[ed] the inquiry from the pursuit of truth" and invited the jury "to give vent to visceral and unreasoned responses." *Id.*

**2.** The appellant in *Hamilton* cited only two excerpts from the prosecution's summation wherein the prosecutor noted the difficulty of living in a community where crime has been so rampant and people are afraid to walk the streets, and where the prosecutor commented that if the jury were to let the defendant go free, then the victims would have died in vain and all others like them would die in vain.

Here, the prosecutor did not limit such remarks to the foregoing passages. The prosecutor stated the following:

In an urban situation, Ladies and Gentlemen, it's now popular to use cliches. Back in a drug epidemic, somebody said, 'just say no.' And all the citizens were up in arms following 'just say no.' Then at another time, someone said, 'get involved.' And then what people call the ghetto code, I don't see anything, I don't know anything, I don't want to become involved.

\* \* \* \* \*

And believe me, Ladies and Gentlemen, at this time when the male role in the community is questioned, it is refreshing to see two men like Mr. Cameron and Mr. Bertha stand up, out of outrage, stand up, because someone has to stand up, with the degree that our young people are laid down.

\* \* \* \* \*

Two finger rings, one gold chain, earlobes bleeding from where the earrings were snatched. Did she leave a legacy? I hope she did. And it's not in a—it's not in a slogan or cliche, don't wear jewelry. It's not in a slang and it's not in a cliche, if you wear jewelry go in a group. What this is about, ladies and gentlemen, is stopping the person from trying to take advantage. Wearing earrings when they sell you those earrings, they don't put a sign on them that says, wearing these earrings might be hazardous to your life. But that's the reality under which we now live.

(N.T. October 15, 1992, 92, 94, 97–98). Again, the prosecutor, in the foregoing passages, improperly encouraged the jury to "get involved" in a manner similar to the witnesses that had testified, but unlike inhabitants of "the ghetto," and help right the wrongs that are faced by young people in urban society.

Finally, in this vein, the prosecutor again improperly characterized the jury as vindicators of general societal problems:

As I sit down, ladies and gentlemen, the buck stops right here. And I'm not talking about the buck that goes up and

down, I'm talking about the buck that you are. You are this community. You are the Commonwealth. This case is entitled the Commonwealth of Pennsylvania versus James Dennis. These are your streets. This is your town. The victims, the witnesses, and the defendants are products of a system that we all support. Mr. Lincoln said, 'judgment falls on a person when there's something within that person we cannot abide.' I would submit to you that's greed and murder. If you believe the witnesses and if you believe them when they say James Dennis is the man, that's the man, that's his face, it was a gun like this, he had a gun like this in his waistband, forget the would have, should have, could haves and deal with it. . . . In this case, I submit to you, Miss Williams suffers in any final solution. Miss Williams is dead, and the evidence shows that James Dennis killed her. The Commonwealth asks you for a verdict of guilty of murder in the first degree. We will not compromise where, I submit to you, that was a cold blooded act of murder, willful, deliberate, and intentional, based on the testimony of the witnesses and the doctor. Thank you. And as I said in my opening, stick a fork in him and turn him over. He will be done when you say he is done.

*Id.* at 102–104.

I believe the foregoing commentary by the prosecutor was improper. Moreover, a review of the record leads this author to conclude that the unavoidable effect of the prosecutor's improper commentary was to prejudice the jury, thereby preventing the rendering of a fair and impartial verdict.

This Court has observed that a prosecutor is in a unique position as both an administrator of justice and an advocate. *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971); *Commonwealth v. Toney,* 439 Pa. 173, 266 A.2d 732 (1970). Accordingly, we have stressed that prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because there is a certain amount of prestige associated with the office, but also because of the fact-finding facilities presumably available to him. *Cherry,*

474 Pa. at 303, 378 A.2d at 804. While a prosecutor must have reasonable latitude in presenting his case and must be free, as well, to make his arguments with "logical force and vigor," *Commonwealth v. Cronin*, 464 Pa. 138, 143, 346 A.2d 59, 62 (1975), an unfortunate result of permitting such latitude is that some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond permissible limits of argument. *Cherry*. I believe this is such a case.[3]

The prosecutor continually encouraged the jury to focus their attention not on the evidence, but on the larger problems of society in rendering their verdict. He consistently appealed to their fears and emotions, reminding them that some people, apparently not them, can go "to sleep without locking their doors," and "walk the streets at night and not be afraid." He stressed that the case was about "right" and "freedom," including "the right to take public transportation without the fear of someone waiting to get paid." He implied that through their verdict, the jurors as "the community," as "the Commonwealth," could "get involved" and vindicate, not just the victim in this case, but all of society, reminding them that "these are your streets," and "your town."

All of these comments violate our warning in *Hamilton*, i.e., that these types of references are inappropriate, irrelevant and should be meticulously avoided. Moreover, it cannot be said that the finding of guilt in this case was not the product of fear or vengeance as advocated by the prosecutor. The role of the jury is to be the arbiters of fact concerning a particular defendant, not the authors of a general policy to correct social ills.

On this record, I would conclude that the unavoidable effect of the prosecutor's comments was to prejudice the jury and

3. See also Section 5.8(d) of the American Bar Association project on Standards for Criminal Justice providing that

[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

prevent them from rendering a fair and impartial verdict in the case.

Accordingly, I would reverse the judgment of sentence and remand for a new trial.

FLAHERTY, C.J., and SAYLOR, J., join this Dissenting Opinion.