J-A17021-16
J-A17022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYREK D. SCALE | |
| Appellant | No. 1509 EDA 2015 |

Appeal from the Judgment of Sentence April 20, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001230-2013

\*\*\*\*\*

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DESHAWN NEWMAN | |
| Appellant | No. 1449 EDA 2015 |

Appeal from the Judgment of Sentence April 20, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001229-2013

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED AUGUST 31, 2016**

Deshawn Newman and Tyrek Scale (collectively, "Appellants") appeal

from their judgments of sentence entered in the Court of Common Pleas of

---

[*] Retired Senior Judge assigned to the Superior Court.

Philadelphia County on April 20, 2015, following their jury-trial convictions as co-defendants for first-degree murder,[1] conspiracy,[2] carrying a firearm without a license[3] and in Philadelphia,[4] and fleeing a police officer.[5] Upon careful review, we affirm.

The trial court summarized the facts of this matter as follows:

On July 26, 2012, at around 10:20 p.m., John Curry was in his home at 4348 Josephine Street watching television when he heard two car doors slam. Curry immediately looked out his window and observed [Appellants] exit a white [car] and walk down Josephine Street towards Kinsey Street while a third man waited in the driver's seat of the car. [Appellants] turned onto [the] 1900 block of Kinsey Street and were out of view of Curry. A few minutes later, Curry heard four gunshots and then saw [Appellants] return to the car and quickly drive away.

Immediately[,] Curry called 911 and described the vehicle as a four[-]door, white Suzuki with a handicap license plate. After speaking to the 911 operator, Curry walked to the 1900 block of Kinsey Street. In the meantime, at around 10:30 p.m., Police Officer Robert Bakos had responded to the radio call for this incident where he observed an unresponsive man, later identified as Wali Patrick, lying on the front porch of 1924 Kinsey Street and a large crowd gathering on the porch of the residence. Curry informed Officer Bakos that the perpetrators had been in a white sedan that had driven towards Torresdale Avenue.

---

[1] 18 Pa.C.S. § 2502.

[2] 18 Pa.C.S. § 903(c).

[3] 18 Pa.C.S. § 6106.

[4] 18 Pa.C.S. § 6108.

[5] 75 Pa.C.S. § 3733(a).

- 2 -

At about this same time, Police Officer Matthew Delaney and his partner, Timothy O'Reilly, while on routine patrol in a marked police vehicle, were parked on the 1800 block of East Allegheny Avenue when they received information from police radio about the four[-]door white Suzuki, with a handicap license plate, occupied by three black males. The officer observed a vehicle matching that description occupied by two black males and decided to follow the vehicle. The vehicle pulled over on Indiana Avenue near the intersection with D Street. Officer Delaney drove past the vehicle and parked out of view of the Suzuki. [Appellants] exited the vehicle and walked down D Street. A few minutes later, [Appellants] returned to the vehicle and drove westbound on Indiana Avenue. The officers followed the vehicle for a few blocks before the car accelerated to a high rate of speed and failed to obey numerous stop signs. About a mile and a half later, the car turned the wrong way on Ann Street where it scraped a telephone pole and crashed onto the front steps of a home on the 2100 block o[f] Ann Street. [Appellant] Scale exited the Suzuki, dropp[ed] what appeared to be a firearm, and ran down the street. Officer O'Reilly followed [Appellant] Scale and arrested him on Orleans Street and Frankford Avenue. [Appellant] Newman exited the vehicle, dropped a silver handgun, and was arrested by Officer Delaney.

A short while later, a police officer asked Curry to go to Ann Street and Frankford Avenue to make an identification. When Curry arrived at Ann Street he observed the same white car he had seen on Josephine Street earlier that evening. [Scale and Newman] were individually shown to Curry and he identified them as the men he had seen on Josephine Street.

According to Dr. Edwin Lieberman, an Assistant Medical Examiner of Philadelphia, Patrick was pronounced [dead] at 11:17 p.m. at Hahnemann University Hospital and his manner of death was homicide. The decedent suffered four gunshot wounds: a contact gunshot wound to the right side of his neck that severed his spinal cord in his neck, a gunshot wound to his abdomen that hit his liver, heart and lungs, a gunshot wound to his back, and a graze wound on his wrist.

At 12:20 a.m., Police Officer Clyde Frasier of the Crime Scene Unit arrived at Kinsey Street and recovered two projectiles from 1924 Kinsey Street, one from the front door and one from the porch. Officer Frasier then travelled to the 2100 block of East Ann Street where the Suzuki had crashed and recovered a .357

- 3 -

Magnum Ruger from the area near the right side passenger door and a .38 caliber Iver Johnson from the front of the vehicle. The Ruger was loaded with three fired cartridge casings and two live rounds in the chamber[,] and the Iver Johnson was loaded with four fired cartridge casings and one empty chamber.

On July 30, 2012, Police Officer Gary Guaraldo of the Crime Scene Unit processed the 2008 Suzuki recovered from Ann Street and obtained a DNA swab from the steering wheel. According to forensic scientist Lynn Haimowitz, the DNA swab from the Steering wheel matched a DNA swab taken from [Appellant] Scale.

According to Police Officer Greg Welsh, an officer experienced in firearms identification, the bullet recovered by the medical examiner was fired from the .357 Magnum Ruger recovered from Ann Street. The second projectile recovered by the medical examiner and one of the projectiles recovered from 1924 Kinsey Street were fired from the Iver Johnson firearm recovered from Ann Street. There was insufficient information to compare the second projectile recovered from 1924 Kinsey Street to either firearm.

According to Pamela Hayward and Khiry Hayward, Patrick's mother and cousin, respectively, Patrick was involved in a fight with a person named Fees the day of his murder in the area of 15th Street and Lehigh Avenue.

At about 9:45 p.m.[,] before the murder, Alice Robinson was returning to her home on Hicks Street in the area of Lehigh Avenue and 15th Street when defendant Scale, a man she knew from the neighborhood[,] asked to use her car for an emergency. Robinson lent her white Suzuki to [Appellant] Scale. [Appellant] Scale did not return her car and the next day she reported her car was stolen.

Dr. Suzanne Mannes, an expert in cognitive psychology, testified on behalf of the [Appellants]. Dr. Mannes testified regarding the phenomena in cognitive psychology of cross-racial identification, distance, and pre-identification lineup instructions and their effects on eyewitness identifications.

Sharon Williams, a private investigator, testified on behalf of [Appellant] Scale. Williams testified that the driving distance between the scene of the murder and Ann Street was about two and a half miles and took about fifteen minutes at night.

- 4 -

> Likia Newman, [Appellant] Newman's aunt, testified that in 2008[, Appellant] Newman was involved in a car crash and as a consequence [he] walked with a limp. [Appellant] Newman subsequently demonstrated his walk for the jury.

Trial Court Opinion, 7/10/15, at 2-6 (citations omitted).

Following a mistrial due to a hung jury on July 14, 2014, a new trial took place on April 13, 2015. On April 20, 2015, Newman and Scale were sentenced; each received concurrent terms of life imprisonment without the possibility of parole for first-degree murder, 10 to 20 years' imprisonment for conspiracy to commit murder, one-and-a-half to three years' imprisonment for carrying a firearm without a license, and one to two years' imprisonment for carrying a firearm in Philadelphia. No additional penalty was imposed for fleeing or attempting to elude a police officer.

On April 29, 2015, Scale filed a post-sentence motion, which the trial court denied. Thereafter, Scale filed a timely notice of appeal and court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

On May 1, 2015, Newman filed a post-sentence motion, which the court denied as untimely. On May 12, 2015, Newman filed a timely notice of appeal. On May 13, 2015, the trial court issued an order requiring Newman to file a concise statement of errors complained of on appeal within 21 days. Newman did not comply. However, Newman filed a petition in this Court requesting that the case be remanded to the trial court to permit him to file

a concise statement pursuant to Rule 1925(b) *nunc pro tunc*.[6]  On October 2, 2015, this Court entered an order permitting Newman to file a concise statement within 21 days.  Newman filed a timely statement on October 19, 2015.

Newman and Scale raise the following issues for our review:[7]

1. Whether the lower court erred in permitting the decedent's mother, Pamela Hayward, and Officer Robert Bakos to testify regarding hearsay statements allegedly made by the decedent indicating that he had engaged in a fight in the area of 15th St[reet] and Lehigh Ave[nue] on the day of the incident in question?

2. Whether the lower court erred in precluding expert testimony regarding the effects of lighting in relation to the reliability of eyewitness testimony?

3. Whether the lower court erred in not giving the [identification] instruction proffered by the defense and instead using its own[,] as the court's instruction failed to advise the jury as to when it must treat an eyewitness' testimony "with caution," a requisite of Pennsylvania law.  In addition, the court's instructions failed to explain how the jury was to consider issues such as "stress," as the court's instruction as worded permitted jurors to use such

_____

[6] When counsel received the order from the trial court to file a Rule 1925(b) statement, he wrote to the trial court advising that the attorney/client relationship had deteriorated to the point where he could no longer represent Newman.  Thereafter, counsel requested that appellate counsel be appointed and filed an application to withdraw from representing Newman.  However, this Court denied counsel's application to withdraw.  Accordingly, counsel filed the petition seeking remand for the filing of a concise statement.  Counsel continues to represent Newman in this appeal.

[7] Newman initially raised a weight of the evidence claim, which he has abandoned on appeal.  Newman's remaining claims include the same issues that Scale raises.

factors to conclude that the identification was more reliable, a position contrary to science?

Brief for Appellant Scale, at 3.

Appellants' first two issues involve the admissibility of evidence, which is generally within the sound discretion of the trial judge. We will reverse the trial court only where the court committed an abuse of discretion. *Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa. Super. 2014). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id.* (quoting *Commonwealth v. Mendez*, 74 A.3d 256, 260 (Pa. Super. 2013)).

In their first issue, Appellants assert that the court erred in permitting hearsay testimony regarding statements the decedent allegedly made indicating he had been in a fight the day of his murder.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Pa.R.E. 801(c). Hearsay is not admissible unless an exception applies to the statement. Pa.R.E. 802. Additionally, a statement is not considered to be hearsay when it is offered for a purpose other than to prove that it is true. *Commonwealth v. Puksar*, 740 A.2d 219, 225 (Pa. 1999). An out-of-court statement is admissible when it is offered to show motive or ill-will rather than to establish the truth of the statement. *Id.*; *see also Commonwealth v. Luster*, 71 A.3d 1029, 1041 (Pa. Super. 2013) (generally, "out-of-court statements by homicide victims are

admissible when the statements are relevant for some other purpose, such as proof of motive or malice"). However, such statements are not admissible where they "are plainly relevant to [a defendant's] motive only to the degree that the hearsay statements [are] true." ***Commonwealth v. Moore***, 937 A.2d 1062, 1072 (Pa. 2007).

Here, Appellants object to testimony provided by Pamela Hayward and Officer Bakos that the decedent had said he had been in a fight on the day of his murder. Appellants argue that the statements show motive based "entirely upon their content being accepted as true." Brief for Appellant Scale, at 14. Appellants also object to the Commonwealth's reference to the statements in its closing argument.

Hayward's statements regarding the fight included the following on direct examination:

> [**Commonwealth**]: And during the day of July 26, 2012, did you have any – did you talk to [the decedent] at all about where he had been that day or about anything that had happened to him?
>
> [**Scale's counsel**]: Judge, I'm going to object to hearsay.
>
> **The Court**: Overruled at this point. Let me hear it.
>
> [**Hayward**]: Yes. [The decedent] came home and he said he had a fight at 15th and Lehigh.
>
> [**Scale's counsel**]: Objection, Your Honor.
>
> **The Court**: That objection is overruled. Members of the jury, if it turns out that it becomes irrelevant, I will tell you down the road, and we'll strike it. But at this point I'm going to let it in.

- 8 -

N.T. Trial, 4/14/15, at 92-93.  Immediately after this testimony, Scale's counsel followed up on cross-examination:

> [**Scale's counsel**]:  Good morning, ma'am.  Ma'am, the fight that you referred to, [the decedent] never mentioned the name Tyrek Scale at all, did he?
>
> [**Hayward**]:  He didn't mention anybody's name.  He just said he had a fight.
>
> [**Scale's counsel**]:  Right.  And you had never received any information that my client was in any way involved in that fight; is that correct?
>
> [**Hayward**]:  I don't know who was involved.

*Id.* at 94-95.  Newman's counsel did not object to Hayward testifying regarding the fight on direct examination.  On cross-examination, Newman's counsel asked one relevant question, inquiring whether Hayward knew of her son being involved with Newman earlier that day, to which she replied that she did not know.  *Id.* at 96-97.

Officer Bakos did not testify regarding the fight on direct examination.  However, Newman's counsel posed the following questions on cross-examination:

> [**Newman's counsel**]:  Okay.  And it's correct to tell the [l]adies and [g]entlemen of the [j]ury that you also spoke to [the decedent's] mother, right?
>
> [**Officer Bakos**]:  Yes.
>
> [**Newman's counsel**]:  And she told you that he had been in a fight over a female, right?
>
> [**Officer Bakos**]:  Yes.

N.T. Trial 4/15/15, at 38. Scale's counsel made no objection. In response, on redirect examination, the Commonwealth had Officer Bakos read the entire statement he had given to detectives about interviewing Hayward. Scale's counsel objected, but the court permitted the statement to be read, subject to a limiting instruction, as follows:

> [**Officer Bakos**]: My answer was "I did speak to the mother of the victim, I believe her name was Pamela Hayward. She was at the scene. She was not a witness to the shooting, but she said that her son had been in a fight earlier in the day on the 1500 block of Lehigh Avenue and the fight was over a female. She said her son told her that they told him they put niggas to sleep around here. They – she had told" –
>
> [**Commonwealth**]: She said –
>
> [**Officer Bakos**]: "Her son had told her they told him they put niggas to sleep around here. That's all she basically said to me."
>
> [**Commonwealth**]: Thank you.
>
> **The Court**: Okay. Members of the [j]ury, I did permit the officer to testify to something that someone else said after the counsel asked about that.
>
> Understand that that's not being offered for the truth of the matter, because we don't have any way to determine whether that's actually true or not because, clearly, the decedent is dead in this case.
>
> However, that information may be relevant for your consideration for what, if anything, happened as a result of that comment being said to his mother. Okay.

*Id.* at 44-45.

At a later point during the trial, Detective David Schmidt testified on direct examination regarding the alleged fight. Neither defense attorney objected and neither Appellant has challenged this testimony in this appeal:

[**Commonwealth**]:  Do you recall there was an interview taken with Khiry Hayward?

[**Detective Schmidt**]: Yes, I do.

[**Commonwealth**]:  Do you recall his relationship with the decedent in this case was that they were cousins?

[**Detective Schmidt**]:  Yes.

[**Commonwealth**]:  Mr. Khiry Hayward gave information to you all at Homicide about a fight that had happened at 15th and Lehigh between the decedent and someone named Fees earlier in the day on July 26; is that correct?

[**Detective Schmidt**]:  That is correct.

[**Commonwealth**]:  All right.  When Mr. Hayward gave that information, he did not – it as your understanding that Fees was not one of these two defendants; is that correct?

[**Detective Schmidt**]:  That is correct.

[**Commonwealth**]:  And you had no information from Mr. Hayward that either of these two defendants was involved in that particular fight at 15th and Lehigh earlier in the day; is that correct?

[**Detective Schmidt**]:  That is correct also.

N.T. Trial, 4/16/15, at 198-99.

During closing arguments, the Commonwealth referred to the above evidence, stating that

at 15th [and] Lehigh, they put niggas to sleep.  That's what [the decedent] told his mother that day when he came home from a fistfight.  Over what?  A girl, over a stupid girl.  These guys didn't want to be disrespected.  Apparently [the decedent] kicked someone's ass at 15th and Lehigh.  That's what happened.  And they put niggas to sleep for that.

[**Newman's counsel**]:  Objection.

[**Scale's counsel**]:  Objection.

- 11 -

> **The Court**: Members of the jury, just as with defense, the attorney is permitted to argue the evidence and all reasonable inferences, and you ultimately decide whether those inferences are reasonable doubt. So based upon this evidence, I would suggest that may be a reasonable inference, so the objection is overruled.
>
> [**Commonwealth**]: [The decedent] went to 15th and Lehigh where his cousin lives. He got into a fistfight over a girl with some guy named Fees. Fees, disrespected, says we, not I, we, my boys, 15th and Lehigh, we hang together, we put people to sleep around here for that. We don't fight with fists. We fight with guns.

N.T. Trial, 4/17/15, at 106-07.

We note that Newman's counsel did not object the first time the fight was mentioned, when Patricia Hayward testified. Moreover, Newman's counsel asked Officer Bakos about the fight, which resulted in a further discussion of the incident during Officer Bakos' redirect examination. Accordingly, Newman has waived this issue. Additionally, as discussed below in response to Scale's arguments, Newman would not be entitled to relief even if he had preserved this issue.

Although Scale argues that evidence of the fight is only relevant if an actual fight took place, we disagree. The statements made by Pamela Hayward were given greater context via Officer Bakos' statement, which was accompanied by a limiting instruction, and the testimony of Detective Schmidt, to which neither Appellant objected. Taken together, the testimony indicated that even if no physical fight took place, animosity appeared to exist between the victim and Fees, an individual from the 15th and Lehigh area who was allegedly connected to Appellants. Accordingly,

- 12 -

the statements indicating a fight took place were admissible to demonstrate motive or ill-will. *Puksar*, *supra*. Thus, the trial court did not abuse its discretion in permitting the testimony. *Belknap*, *supra*.

We also note that although Scale's counsel consistently objected each time Pamela Hayward and Officer Bakos mentioned the fight, he did not object to Detective Schmidt's testimony. Detective Schmidt testified to learning about the fight from the victim's cousin, Khiry Hayward; thus, information about the fight was gathered from a source other than Pamela Hayward or Officer Bakos. This indicates that the testimony to which Scale's counsel objected was cumulative of other testimony.

Because the testimony objected to was cumulative of other unchallenged testimony, any error in admitting it was harmless. *See Commonwealth v. Foy*, 612 A.2d 1349, 1352 (Pa. 1992) (error in admitting testimony harmless where: (1) error did not cause prejudice; (2) erroneously admitted evidence cumulative of other, untainted, substantially similar evidence; or (3) properly admitted, uncontradicted evidence of guilt so overwhelming and error so insignificant by comparison that error could not have contributed to verdict). Moreover, the evidence of Scale's and Newman's guilt was overwhelming. John Curry observed Appellants shortly before the murder, exiting a vehicle with handicapped plates. After Curry heard gunshots, he saw Appellants return to the car and drive away. Following a high-speed chase involving police, Appellants crashed the car, which was identifiable because of its plates. Curry also identified Appellants.

The murder weapons were found near the crash, and Scale's DNA was recovered from the steering wheel of the car, which had been loaned to him by a neighbor. Accordingly, Appellants are due no relief regarding the admission into evidence of the statements about the fight. *Id.*

Next, Appellants assert that the trial court erred in precluding an expert from testifying regarding the effects of lighting on the reliability of eyewitness testimony.

The admission of expert testimony is governed by Pennsylvania Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

As we noted in ***Commonwealth v. Selenski***, 117 A.3d 1283 (Pa. Super. 2015), "[f]or over twenty years, Pennsylvania case law placed a *per se* ban on expert testimony regarding the reliability of eyewitness identification, holding that such testimony would intrude upon the jury's

basic function of deciding credibility." *Id.* at 1284-85 (citations and quotation marks omitted). However,

> [w]e now allow for the possibility that such expert testimony on the limited issue of eyewitness identification . . . may be admissible, at the discretion of the trial court, and assuming the expert is qualified, the proffered testimony relevant, and will assist the trier of fact. Of course, the question of the admission of expert testimony turns not only on the state of the science proffered and its relevance in a particular case, but [also] on whether the testimony will assist the jury. Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate. . . . We find the defendant must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation. The proof should establish the presence of factors[, such as stress or race,] which may be shown to impair the accuracy of eyewitness identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

*Id.* at 1285 (quoting *Commonwealth v. Walker*, 92 A.3d 766, 792 (Pa. 2014)).

Instantly, Appellants' expert witness, Dr. Mannes, made a proffer to the court regarding visibility, cross-racial identification, pre-identification lineup instructions and their effects on eyewitness identifications. The trial court considered the proffer and "conclud[ed] that the witness will be permitted to testify about the show-up and cross-racial identification." N.T. Trial, 4/14/15, at 38. The trial court thus permitted testimony regarding the effects of race on identification, consistent with our decisions in *Walker* and *Selenski*.

- 15 -

However, the court rejected the proffer of expert testimony as to visibility based on the amount of light, since "the effects of lighting on eyewitness accuracy are well within the understanding of the average layperson." Trial Court Opinion, 7/10/15, at 9. Accordingly, the proffered testimony would not assist the jury in understanding "specialized knowledge [that] is beyond that possessed by the average layperson." Pa.R.E. 702. Thus, the trial court did not abuse its discretion in refusing to permit expert testimony regarding the effects of lighting conditions on identification accuracy. **Walker**, **supra**.

In their final claim, Appellants assert that the trial court erred by not giving jury instructions regarding identification that were requested, claiming that "the court's instruction, as worded, permitted jurors to conclude that the identification was more reliable than it may have been[,] which was contrary to science and contrary to established case law." Brief for Appellant Newman, at 31.

> When reviewing a trial court's jury instructions, we
>
> will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

**Commonwealth v. Antidormi**, 84 A.3d 736, 754 (Pa. Super. 2014) (citations omitted). "[A] trial court need not accept counsel's wording, but

may choose its own so long as the area [of law] is adequately, accurately and clearly presented to the jury for their consideration." **Commonwealth v. Ohle**, 470 A.2d 61, 70 (Pa. 1983) (citation and quotation marks omitted).

In arguing this issue, Appellants cite to cases stemming from **Commonwealth v. Kloiber**, 106 A.2d 820 (Pa. 1954). "A **Kloiber** instruction informs the jury that an eyewitness identification should be viewed with caution when either the witness did not have an opportunity to view the defendant clearly, equivocated on the identification of the defendant, or has had difficulties identifying the defendant on prior occasions." **Commonwealth v. Sanders**, 42 A.3d 325, 332 (Pa. Super. 2012) (citing **Commonwealth v. Ali**, 10 A.3d 282, 303 (Pa. 2010)).

Here, Curry had the opportunity to view Appellants clearly, unequivocally identified them prior to and at trial, and did not otherwise have difficulties in identifying them. Thus, a **Kloiber** charge was not appropriate in the instant matter. **See Commonwealth v. Ali**, 10 A.3d 282, 303 (Pa. 2010) ("Where an eyewitness has had 'protracted and unobstructed views' of the defendant and consistently identified the defendant 'throughout the investigation and at trial,' there is no need for a **Kloiber** instruction." (quoting **Commonwealth v. Dennis**, 715 A.2d 404, 411 (Pa. 1998)).

Appellants additionally argue that the instructions "simply listed the factors that might affect the reliability of eyewitness testimony" and failed to explain to the jury "how those issues would negatively affect eyewitness

testimony—and therefore left open the possibility that the jury might consider those factors to have bolstered the reliability of the eyewitness'[] testimony." Brief for Appellant Newman, at 32-33. Appellants base this claim on their assertion that the Supreme Court in **Walker** accepted as "settled science" that certain factors make eyewitness testimony less reliable. However, in **Walker**, the Court explicitly rejected the notion that the research and studies considered in the case were accepted as "definitive." **See Walker**, **supra** at 792. Accordingly, in the instant matter, it would have been improper for the jury instructions to specify the type of impact the factors should have had regarding the reliability of the identifications. Moreover, the court gave the standard jury instruction regarding factors to consider in evaluating identification testimony. Thus, we discern no error on the part of the trial court.

Judgments of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/31/2016