J-S59018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAHEEM JOHNSON | |
| Appellant | No. 954 EDA 2015 |

Appeal from the PCRA Order March 19, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0004848-2002

BEFORE:  BENDER, P.J.E., OLSON and FITZGERALD,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED OCTOBER 07, 2016**

Appellant, Raheem Johnson, appeals from the order entered on March 19, 2015, dismissing his first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  Upon review, we affirm.

On direct appeal, a prior panel of this Court recited the facts of this case, as summarized by the trial court, as follows:

> Chester City police responded to a call of shots fired in the vicinity of 6th and Lloyd Streets on October 29, 2000 in the early morning hours.  Upon arrival, the police observed two motionless bodies on the ground.  Both had gunshot wounds.  The bodies were located close to units 1101 and 1103 of the Dorian Court Apartments in the City of Chester.  Paramedics arrived and observed that one of the victims was still breathing.  This man, Juan Perez, received emergency care at the scene and was transported to Crozer-Chester Medical Center.  Juan Perez survived several hours before succumbing to the gunshot wound to his head.  The second individual, Jose Perez, was declared dead at the scene.  Two bullets were recovered, one from each of the victims.  An expert in the field of firearms and tool mark

*Former Justice specially assigned to the Superior Court.

examination testified that the bullets came from the same weapon.

The medical examiner testified Jose Perez sustained a single gunshot wound to the back of his head. The gunshot wound was the sole cause of his death and a paramedic on the scene pronounced him dead at 1:21 a.m. on [October] 29, 2000. Juan Perez sustained a single gunshot wound to the front of his forehead that penetrated his skull. Although unconscious, Juan Perez remained alive until 8 p.m. on October 29, 2000. The cause of death was the single gunshot wound to his forehead.

Several eyewitnesses saw Appellant murder the Perez brothers. Craig Gibson testified that he lived in the vicinity of the shooting with his girlfriend. He knew both Appellant and the Perez brothers before this incident. He saw the Perez brothers, Appellant, and a few people he knew by nicknames as he walked toward his girlfriend's home in the early morning hours of October 29, 2000. He stopped to watch the young men engage in 'play fighting.' Next, he saw Appellant point a gun at Juan Perez's head and fire a single gunshot into the front of his head. Juan Perez fell to the ground. Jose Perez went to the ground and hugged his brother and pleaded with Appellant for his brother's life saying, 'Please don't shoot my brother. He's drunk.' Appellant fired a second shot, this time at Jose. Gibson testified that after the second shot was fired, Jose landed on top of his brother. The police found the brothers in this position when they arrived a few minutes later. Gibson told the jury that he witnessed Appellant run from the area after the shooting took place.

Shante Powell testified on behalf of the Commonwealth. She had known Appellant for seven or eight years before the killings and she witnessed the events of October 29, 2000. During the evening of October 28, 2000, Powell was visiting with friends in the Dorian Court Apartments. Sometime after midnight, she heard people arguing outside the apartment and looked out the window to investigate the disturbance. She saw Appellant, two individuals she knew by nicknames and the Perez brothers. Juan Perez was on the ground and Appellant stood over him and 'was just hollering at him.' She could not distinguish the words

- 2 -

uttered by Appellant, but she saw him point a gun at Juan and fire a single shot. . . . After watching Appellant shoot Juan, Powell moved away from the window and sat on the couch. Five or ten seconds after hearing the first gunshot, she heard a second gunshot. Next, she heard a car drive away and then looked outside and saw the motionless bodies of the Perez brothers. Jose Perez had his arm around his brother Juan. A few seconds later, the doorbell to the apartment rang and Appellant entered the apartment and began to change his clothes. Powell observed blood on Appellant's clothes and saw him wipe the clothes with bleach and put them in a bag. Appellant stayed in the apartment until six o'clock in the morning on the 29th and he left the apartment with his clothes in the bag.

Brian Doukas testified on behalf of the Commonwealth and told the jury that he spoke to Appellant in August or September 2002 while they were inmates at Chester County Prison. Appellant admitted to Doukas that he murdered two brothers with a gun near an apartment building. Appellant made the admission shortly after his arraignment on the murder charges. When he returned to the Chester County Prison, he asked Doukas if he knew of a good criminal defense attorney, one who handles homicide cases. This inquiry led to a discussion about the facts of the homicides. Appellant told Doukas about a confrontation involving the victims and some friends which occurred earlier in the evening of the murders. Later that evening[,] Appellant admitted that he shot one of the brothers involved in the confrontation and then shot the second brother because he was a witness. When asked to explain the reason for the shooting, Appellant explained that 'nobody messed with him and his crew or him and his, his boys.' Appellant also admitted that after the shooting, he left the scene and police never recovered the gun.

\* \* \*

The day after the murders, Appellant met with his girlfriend Crystal Horsey, and admitted to her that he killed the Perez brothers because they 'underestimated him.'

- 3 -

*Commonwealth v. Johnson*, 919 A.2d 972 (Pa. Super. 2007) (unpublished memorandum) at 3-5, *citing* Trial Court Opinion, 6/19/2006, at 2-5.

On October 1, 2004, a jury convicted Appellant of two counts each of first-degree murder, aggravated assault, and recklessly endangering another person (REAP) and one count of possession of an instrument of crime (PIC).[1] The jury was unable to reach a unanimous decision regarding Appellant's sentence. As a result, the trial court imposed consecutive terms of life-imprisonment for the murder convictions. The trial court also imposed a consecutive term of one to five years' incarceration for PIC, but no additional penalty for the aggravated assault and REAP convictions. On January 17, 2007, this Court affirmed Appellant's judgment of sentence. *Id.* On August 10, 2007, our Supreme Court denied further review. *Commonwealth v. Johnson*, 929 A.2d 644 (Pa. 2007).

On January 28, 2008, Appellant filed a timely *pro se* PCRA petition. The PCRA court appointed counsel for Appellant. Counsel sought to withdraw pursuant to *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*). On January 20, 2009, the PCRA court denied appointed counsel's petition to withdraw and directed him to file an amended PCRA petition. Counsel, however, filed a second *Turner*/*Finley* petition to withdraw from

---

[1] 18 Pa.C.S.A. §§ 2502(a), 2702, 2705, and 907, respectively.

representation. By order entered on December 29, 2009, the PCRA court dismissed Appellant's PCRA petition. Thereafter, Appellant filed a timely *pro se* notice of appeal. On June 11, 2013, this Court vacated the PCRA court's order denying relief and remanded the case for further proceedings. Appellant obtained new PCRA counsel and she subsequently filed an amended PCRA petition on Appellant's behalf. On October 10, 2014, the PCRA court held an evidentiary hearing on the amended PCRA petition. On March 19, 2015, the PCRA court denied Appellant relief. This timely *pro se* appeal resulted.[2]

On appeal, Appellant raises the following *pro se* issues for our review:

> I.   The Commonwealth violated Appellant's Fifth, Sixth, and Fourteenth Amendment right[s] by intentionally failing to disclose the existence of an arrangement/agreement made to [a] key

_____

[2]   On April 1, 2015, Appellant filed a timely *pro se* notice of appeal despite his continued representation by counsel. The PCRA court ordered Appellant to file a concise statement pursuant to Pa.R.A.P. 1925(b). Appellant complied timely *pro se*. The PCRA court issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 15, 2015. Thereafter, by *per curiam* order entered on August 27, 2015, this Court directed the PCRA court to conduct an on-the-record determination as to whether Appellant wished to proceed *pro se* and whether Appellant's waiver of counsel was knowing, intelligent and voluntary pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998). On October 2, 2015, following a hearing, the PCRA court entered an order permitting PCRA counsel to withdraw and allowing Appellant to represent himself and proceed *pro se*. We may now address Appellant's claims. **See Commonwealth v. Figueroa**, 29 A.3d 1177, 1183 (Pa. Super. 2011) (following a remand for a **Grazier** hearing, if an appellant waives his right to counsel before both the PCRA court and this Court, we may address the merits of Appellant's remaining PCRA claims).

Commonwealth witness in exchange for his cooperation and testimony inculpating Appellant.

II.    Appellant was denied his right[s] under Article 1 § 9 of the Constitution of the Commonwealth of Pennsylvania and the Sixth Amendment to the Constitution of the United States of America to effective assistance of counsel in that counsel: (a) failed to object to the prosecutor speaking on facts outside of the record and suggesting he [knew] something the jury [did not] and (b) failed to object to the prosecutor's improper and prejudicial closing argument.

III.   Appellant was denied his right[s] under Article 1 § 9 of the Constitution of the Commonwealth of Pennsylvania and the Sixth Amendment to the Constitution of the United States of America to effective assistance of counsel in that counsel failed to obtain and use available evidence to impeach key Commonwealth witnesses.

IV.    Appellant was denied his right[s] under Article 1 § 9 of the Constitution of the Commonwealth of Pennsylvania and the Sixth Amendment to the Constitution of the United States of America to effective assistance of counsel in that trial and [appellate] counsel failed to properly preserve and raise a meritorious [appellate challenge to] the trial court['s abuse of discretion] in failing to grant Appellant a 24[-]hour continuance to retain private counsel of [Appellant's] choice.

Appellant's Brief at 3 (complete capitalization omitted).

Our standard of review over the denial of a PCRA petition is well-settled. "As a general proposition, we review a denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." *Commonwealth v. Roane*, 142 A.3d 79, 86–87 (Pa. Super. 2016) (citation and brackets omitted). "A PCRA court's

credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court. *Id.*

In his first issue presented, Appellant contends the Commonwealth failed to disclose a deal it had with Craig Gibson, wherein Gibson agreed to testify for the Commonwealth against Appellant in exchange for favorable sentencing treatment in five open cases (for narcotics delivery and simple assault) that were pending against Gibson at the time of Appellant's trial. *Id.* at 12-13. Appellant avers Gibson was facing a maximum of 34 years of incarceration, but only received a county sentence of less than one year of imprisonment. *Id.* at 14. Accordingly, Appellant argues the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) "by intentionally suppressing the existence, nature and scope of the deal [Gibson] received." *Id.* at 7. At the PCRA evidentiary hearing, Appellant presented the notes of testimony from Gibson's sentencing hearing. From those notes of testimony, Appellant relies on the prosecutor's statements that Gibson "lived up to his arrangement with the Commonwealth" and "urg[ed]" the sentencing judge to give "consideration" for Gibson's testimony in Appellant's case as "a pivotal factor[.]" *Id.* at 14, *citing* N.T. Gibson's Sentencing Hearing, 10/12/2004, at 10-12. Appellant asserts that "[i]f there was in fact no [a]rrangement as the [PCRA] court concluded, [t]hen it was impossible for Gibson to have lived up to the something that didn't exist." *Id.* at 15.

Our Supreme Court previously determined:

Under **Brady**, the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. "[T]o establish a **Brady** violation, a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant." **Commonwealth v. Gibson**, 951 A.2d 1110, 1126 (Pa. 2008).

The burden of proof is on the defendant to demonstrate that the Commonwealth withheld or suppressed evidence. The United States Supreme Court has held, "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." **United States v. Bagley**, 473 U.S. 667, 675 (1985) (footnote omitted).

\* \* \*

"To satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." **Gibson**, 951 A.2d at 1126–1127. […M]ateriality extends to evidence affecting the credibility of witnesses, rather than merely to purely exculpatory evidence. **See Giglio v. United States**, 405 U.S. 150, (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."). Moreover, [our Supreme Court has] held that the protection of **Brady** extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. **See Commonwealth v. Green**, 640 A.2d 1242, 1245 (Pa. 1994) (holding that courts must "consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well."). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Kyles v. Whitley**, 514 U.S. 419, (1995) (internal quotation marks omitted).

> As to **Brady** claims advanced under the PCRA, a defendant must demonstrate that the alleged **Brady** violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." **See Commonwealth v. Copenhefer**, 719 A.2d 242, 259 (Pa. 1998). [...T]he United States Supreme Court has held that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." **United States v. Agurs**, 427 U.S. 97, 109–110 (1976).

**Commonwealth v. Cam Ly**, 980 A.2d 61, 75–76 (Pa. 2009).

At the PCRA hearing, Appellant conceded that defense counsel told Appellant of a deal between the Commonwealth and Gibson for Gibson's trial testimony against Appellant. N.T., 10/10/2014, at 70. Appellant testified that defense counsel did not give him specifics of that deal. **Id.** Trial counsel for Appellant testified that he had only one conversation with the Commonwealth wherein the prosecutor agreed that he "would advise [the sentencing judge] of Mr. Gibson's cooperation [] during [Appellant's] trial." **Id.** at 9. At Appellant's trial, Gibson testified that the prosecutor would appear on his behalf at his sentencing hearing to tell the sentencing judge about his cooperation in Appellant's trial. N.T., 9/28/2004, at 56-57. However, Gibson also testified that there were no promises regarding the actual sentence to be imposed upon him and, ultimately, his sentencing judge would decide upon a term of imprisonment. N.T., 9/27/2004, at 211. The Commonwealth, in its closing argument, stated that it would tell the sentencing judge in Gibson's cases that he was cooperative, but that the

ultimate sentence Gibson was to receive was to be decided by the judge. N.T., 9/30/2004, at 39.

Upon review of the notes of testimony from Gibson's sentencing hearing, the prosecutor stated, in full:

> Thank you, Your Honor. Your Honor, I just finished a prosecution of the case of **Commonwealth v. [R]aheem Johnson**, at 4848 of '02. This was a double homicide occurring in October of 2000. It actually took two years for detectives involved to amass sufficient evidence to make an arrest. The defendant in that case, Your Honor, was quite a formidable, I'll say had quite the reputation in Chester. And it wasn't actually until he was arrested on an unrelated case, did the case actually break. The case broke, in part, and substantially in part, because of a statement given by [] Mr. Gibson. He was cooperative at that time, for I'll say consideration that a period he was entitled to. But certainly disproportionate to the risk that he put himself at by virtue of his statement and his cooperation with the Commonwealth back in September of 2002. As a result of that statement and another statement the Commonwealth received – in fact, we received numerous statements once the defendant in that case was incarcerated on other charges. Mr. Gibson came forward, other people came forward, an arrest was eventually made. But when the case came to trial, Your Honor, we had three witnesses who were present at the scene who were going to testify. One of the witnesses was actually under a material witness warrant. He was on bail, and we expected him to appear at trial because he was on a monthly status call, and he appeared with his attorney each month. However at the time of trial, he was a failure to appear. There is a warrant outstanding for him at the present time. I intend to prosecute him, or at least get, get him on a contempt action when he's eventually arrested. But Mr. Gibson, in the Commonwealth's opinion not only lived up to his arrangement with the Commonwealth to testify, and testify truthfully. But he was not intimidated at the time of trial b[y] people who came into the courtroom. And at one point the courtroom had a substantial number of people, friends

- 10 -

of [Appellant]. Who I found to be there for one purpose, and one purpose only, and that was to intimidate [Mr. Gibson]. Because after he testified, they left. He wasn't intimidated. He was – he held true to his statement. And, for that reason, Your Honor, the Commonwealth is suggesting to the [c]ourt that he was a pivotal factor in that prosecution, and he should [get] consideration for that. And we would urge you to do so, Your Honor. Thank you.

N.T., 10/12/2004, at 10-11 (original brackets omitted).

We conclude there is no merit to Appellant's first claim. At Appellant's trial, Gibson testified that the Commonwealth agreed to tell Gibson's sentencing court about his cooperation in this matter, but would not recommend a specific sentence. Thereafter, at Gibson's sentencing hearing, the prosecutor told the judge that Gibson cooperated with the Commonwealth in Appellant's case, highlighting the adversity Gibson faced in doing so, and asked the judge to consider that factor when imposing Gibson's sentence. The Commonwealth, however, did not suggest a specific sentence. The Commonwealth did not recommend a mitigated or reduced sentence for Gibson. Appellant conceded that he knew Gibson agreed to testify for the Commonwealth prior to trial and that Gibson's potential for bias was placed before the jury. Hence, there is no indication that the Commonwealth suppressed any evidence. Thus, Appellant has not shown that the truth-determining process was undermined or that no reliable

adjudication of guilt or innocence could have taken place. Accordingly, there is no merit to Appellant's first claim.[3]

Appellant's next three claims allege that trial counsel was ineffective. We review ineffective assistance of counsel claims under the following standard:

> We begin with the presumption that counsel rendered effective assistance. To obtain relief on a claim of ineffective assistance of counsel, a petitioner must rebut that presumption and demonstrate that counsel's performance was deficient, and that such performance prejudiced him.
>
> *       *       *
>
> Specifically, a petitioner must show: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or inaction; and (3) counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error.
>
> A claim of ineffectiveness will be denied if the defendant's evidence fails to meet any one of these prongs.

---

[3] To the extent that Appellant argues that Gibson's sentencing hearing transcripts constitute newly discovered evidence under the PCRA, he is not entitled to relief on that basis either. A petitioner may be eligible for PCRA relief if he pleads and proves that his conviction or sentence resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi). Here, however, Gibson received a sentence wholly consistent with the agreement offered by the Commonwealth. Thus, the notes from Gibson's sentencing hearing do not prove there was previously unavailable, exculpatory evidence that would have changed the outcome of Appellant's trial.

***Commonwealth v. Oliver***, 128 A.3d 1275, 1284 (Pa. Super. 2015) (internal citations and quotations omitted).

In his second issue presented, Appellant claims trial counsel failed to object to the prosecutor's closing argument when the Commonwealth alluded to facts outside of the record and personally vouched for the truthful character of the Commonwealth's witnesses. Appellant's Brief at 18-24. More specifically, Appellant claims the prosecutor "suggested that the witnesses wouldn't risk testifying unless it was the truth" and submitted that Appellant caused fear among the witnesses. ***Id.*** at 18-19. In turn, Appellant avers there was no trial evidence to support the PCRA court's determination that "[t]he violent and hardened lifestyle that came along with living in the witnesses' community was established during trial as a part of the record." ***Id.*** at 19, *citing* PCRA Court Opinion, 7/15/2015, at 7. Appellant also claims the prosecutor "spoke on facts outside the record," when the Commonwealth stated, in closing, that although Doukas' recollection of the date on which his conversation with Appellant in prison took place "was wrong by a month," Doukas "wasn't wrong about the conversation." ***Id.*** at 20.

This Court has previously determined:

> It is well[-]settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to

> prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict.
>
> In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well[-]settled that the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.
>
> *          *          *
>
> It is settled that it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses. However, the prosecutor may comment on the credibility of witnesses. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor. If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility.

*Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (internal citations and quotations omitted).

Upon review of the notes of testimony from trial, we conclude that the prosecutor's comments were fair response to trial counsel's closing argument. During closing argument, defense counsel attacked the credibility of the Commonwealth's witnesses. *See generally* N.T., 9/30/2004, at 17-28; *see also id.*, at 28 ("[D]id the demeanor of Crystal Horzee, Brian Doukas, Craig Gibson, and Shante Powell, did that instill a whole lot of confidence within you that they were being truthful during the course of this trial? I suggest not, ladies and gentlemen."). Additionally, at trial, counsel

- 14 -

for Appellant questioned Doukas at length regarding the timing of the prison conversation between the two men, suggesting they were either not imprisoned at the same time or housed in different, secured sections of the prison. Defense counsel highlighted this again during closing argument. *Id.* at 25-26. In response, the Commonwealth gave record-supported reasons to rebut these assertions. We agree with the PCRA court that the Commonwealth did not engage in prosecutorial misconduct. Accordingly, there is no merit to Appellant's claim that trial counsel was ineffective for failing to object to the Commonwealth's closing remarks.

In his third allegation, Appellant claims trial counsel was ineffective for failing to obtain evidence to impeach Gibson, Doukas, and Powell. We will examine the argument regarding each witness individually.

First, we examine Appellant's ineffective assistance of counsel claim in relation to Gibson. At trial, Gibson claimed he saw Appellant every day for a year and one-half starting in 1998. Appellant's Brief at 24. Appellant argues "[a s]entence status sheet from the [D]epartment of [C]orrections […] proves Appellant turned himself into custody" during that time period. *Id.* "Thus, an investigation would have disclosed that it was impossible for Gibson to have seen Appellant every day for a year and [one-]half before the murders which would have directly contradicted Gibson's testimony[.]" *Id.* at 25 (internal quotations omitted).

The PCRA court determined:

> Gibson's answer was meant to reflect that he knew [Appellant] and frequently saw [Appellant] in their neighborhood. This does not take away from the credibility of the witness. These matters are inconsequential to the outcome of this case, and are therefore, meritless claims of ineffective assistance of counsel.

PCRA Court Opinion, 7/15/2015, at 8. Upon review, we agree. Defense counsel questioned Gibson at length about his relationship with Appellant in connection with whether Gibson could identify Appellant. Gibson also testified that he knew Appellant, from growing up in Chester, for "[t]en, 12 years, 13 maybe." N.T., 9/27/2004, at 189. Appellant has not plead and proven that the outcome of his trial would have been different had trial counsel impeached Gibson with evidence of Appellant's incarceration in the years preceding the murders.

Next, we examine Appellant's claim that counsel was ineffective for failing to impeach Doukas. Appellant argues "[t]he alleged admission [to Doukas] was made immediately after Appellant returned to prison on September 13, 2002, after being arraigned on murder charges." Appellant's Brief at 26. Appellant claims he introduced evidence of the physical layout of the prison that "[p]roved it was impossible for Appellant and Doukas to have had physical access to each other on the day Doukas very firmly and specifically testified the alleged admission [was] made." *Id.*

At trial, Doukas testified "he was pretty sure" he had a conversation with Appellant in prison on "either August 9 or August 10" 2002. N.T., 9/28/2004, at 340, 346. Martin Bennethum, the legal records supervisor at

Chester County Prison, testified that Appellant was not incarcerated at that prison until August 27, 2002, making it impossible for the two men to have had a conversation in early August 2002. N.T., 9/29/2004, at 69-71. Doukas, however, also testified that the conversation took place on the "day [Appellant was] arraigned on double homicide charges." *Id.* at 322. The parties stipulated that Appellant was arraigned on September 13, 2002. N.T., 10/10/2014, at 18. Both men were housed in the same prison block (H-block) from August 29, 2002 until September 10, 2002. N.T., 9/29/2004, at 70. They were also in the same cellblock (K-block) from October 15, 2002 until November 4, 2002. *Id.* at 74. At the PCRA hearing, trial counsel testified that his strategy was to impeach Doukas based upon his inconsistencies in giving different dates on which the conversation may have taken place. N.T., 10/10/2014, at 20-21. Trial counsel further testified that Appellant told him it would be difficult, but not impossible, for the two men to have had a conversation when they were in different cellblocks. *Id.* A prison official confirmed this fact. *Id.* at 103. Because the conversation could have taken place when the men were in different cellblocks, counsel confined his efforts to impeach Doukas by highlighting the inconsistencies in his testimony, including Doukas' belief that the conversation took place on September 13, 2002. *Id.* at 28-32.

The PCRA court determined that trial counsel impeached Doukas by showing the conversation could not have taken place in August 2002,

because Appellant had not yet been incarcerated in Chester County. PCRA Court Opinion, 7/15/2015, at 8-9. We agree. Moreover, at trial, trial counsel questioned Doukas regarding his extensive criminal history in an attempt to impeach his credibility. N.T., 9/28/2004, at 333-337. We have previously determined that counsel cannot be deemed ineffective for failing to impeach a witness in a particular way, where counsel has impeached the witness by other means. *See Commonwealth v. Solano*, 129 A.3d 1156, 1175 (Pa. 2015) (trial counsel did not provide ineffective assistance by failing to impeach witnesses with evidence of certain prior convictions where counsel attempted to impeach witnesses by other means on cross-examination and the Commonwealth had already brought to the jury's attention that those witnesses had criminal histories); *see also Commonwealth v. Dennis*, 715 A.2d 404, 408–409 (Pa. 1998) (holding counsel not ineffective for failing to impeach witness in one particular way, where counsel impeached witness in other ways). Hence, we deem this aspect of Appellant's third claim meritless.

Next, Appellant claims trial counsel was ineffective for failing to impeach Powell. Appellant claims Powell was "a vengeful ex-girlfriend" despite Powell's testimony at trial "that her mother and Appellant's mother held [themselves] out to be cousins." Appellant's Brief at 31-32. Appellant claims counsel was ineffective for failing to question Powell about their relationship because she had a bias to lie about Appellant at trial. *Id.*

Upon review of the trial transcript, Powell testified that her mother and Appellant's mother claimed they were cousins. N.T., 9/28/2004, at 172. However, when asked, "Do you know that? What level of cousin?[,]" Powell responded, "No." *Id.* The PCRA court determined these statements were "not meant to assert that the witness and [Appellant] were actually cousins, but Ms. Powell had known [Appellant] for a number of years and was able to identify him on sight." PCRA Court Opinion, 7/15/2015, at 7-8. The PCRA court further concluded that "Powell's credibility with the jury would not have been affected by whether or not she was actually related to [Appellant]." *Id.* at 8. We agree. *See Commonwealth v. Copenhefer*, 719 A.2d 242, 254 (Pa. 1998)(a petitioner fails to demonstrate that counsel was unreasonable for declining to pursue a minor inconsistency or that he was prejudiced thereby). Moreover, defense counsel questioned Powell extensively about the timing of her statement to police. She denied being present until two years after the murders and made a statement to police only after her arrest for assault and other related charges. N.T., 9/28/2004, at 248-251. Defense counsel also questioned Powell about her criminal record. Hence, for these additional reasons, counsel cannot be deemed ineffective because he sought to impeach Powell by other means. *See Solano* and *Dennis,* **supra**. Accordingly, based on the foregoing reasons, Appellant's third claim asserting trial counsel's ineffectiveness for failing to impeach Gibson, Doukas, and Powell must fail.

Finally, Appellant claims ineffective assistance of counsel for failing to argue on direct appeal that the trial court abused its discretion when it denied Appellant's request for a continuance. Appellant's Brief at 35. He claims the continuance was necessary "to permit Appellant, who had just unexpectedly obtained funds from family members, to retain private counsel, after Appellant [continually] complained about [appointed] counsel['s] representation." *Id.*

We previously determined:

> It is clear that a person charged with a crime has a constitutional right to the assistance of counsel which includes the right to a reasonable opportunity to obtain counsel of his or her own choice. That right, however, is not absolute. As we stated []:
>
> > The desirability of permitting a defendant additional time to obtain private counsel of his choice must be weighed against the public need for the efficient and effective administration of justice. The matter of continuance is traditionally one within the discretion of the trial judge, and no prophylactic rule exists for determining when a denial of a continuance amounts to a violation of due process. Each case must be decided by balancing the competing interests, giving due regard to the facts presented. It is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

***Commonwealth v. Boettcher***, 459 A.2d 806, 809–810 (Pa. Super. 1983) (internal citations, quotations, and original brackets omitted) (finding no abuse of discretion where defendant had been represented by the same public defender since arrest and had never indicated that she wished to retain private counsel until the date of trial and where defendant never claimed to be dissatisfied with the public defender's representation). "[T]his Court has repeatedly condemned the practice of waiting until the day of trial to request a continuance for the purpose of obtaining a new attorney." ***Commonwealth v. Antidormi***, 84 A.3d 736, 746 (Pa. Super. 2014) (internal quotations omitted), *citing* ***Boettcher***, 459 A.2d at 810.

In this case, the PCRA court determined Appellant "waited until the day of trial [...] to request a continuance to obtain private counsel[.]" PCRA Court Opinion, 7/15/2015, at 9. It further concluded that trial counsel was prepared for trial and Appellant was satisfied with his court-appointed representation. ***Id.*** Moreover, Appellant at one point suggested that appointed-counsel could serve as his private counsel. ***Id.*** Upon review, we agree that a continuance was properly denied. Appellant recognized that a private attorney was not going to be ready to commence trial. N.T., 9/14/2004, at 6. Appellant did not fault appointed counsel's representation, but felt he "would be more comfortable coming into trial with a paid lawyer that's working on my behalf and [knowing] my family's paying for it." ***Id.*** at 7. Appointed counsel also testified that despite their differences in trial

strategy, counsel explained to Appellant "ultimately it [wa]s his decision" on how they proceeded. *Id.* Here, the trial court weighed the competing interests between obtaining counsel of Appellant's choice and judicial delay. We discern no abuse of discretion and, therefore, no derivative ineffectiveness claim. Appellant's last claim lacks merit.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2016